[No. S054501. Dec. 29, 1997.]

AEROJET-GENERAL CORPORATION et al., Cross-complainants and Appellants, v.
TRANSPORT INDEMNITY COMPANY et al., Cross-defendants and Respondents.

## COUNSEL

Jose N. Uranga, Nossaman, Guthner, Knox & Elliott, Scott P. DeVries, Kurt W. Melchior, Carl L. Blumenstein and Tad Pethybridge for Cross-complainants and Appellants.

Daniel E. Lungren, Attorney General, John A. Saurenman, Deputy Attorney General, Cotkin & Collins, Roger W. Simpson, Brobeck, Phleger & Harrison, William R. Irwin, Donald W. Brown, Tom M. Freeman, Edith M. Hofmeister, Munger, Tolles & Olson, Cary B. Lerman, Charles D. Siegal, Howrey & Simon, Robert H. Shulman, John E. Heintz, Mindy C. Davis, Heller, Ehrman, White & McAuliffe, David B. Goodwin, Brian P. Brosnahan, Joshua Koltun, Anderson, Kill & Olick, Jordan S. Stanzler, Deborah M. Mongan and John A. MacDonald as Amici Curiae on behalf of Cross-complainants and Appellants.

Francis J. Stillman, Loraine A. Wallace, Michael Skaggs, Rivkin, Radler & Kremer, Donald McMillan, George Keller, Bishop, Barry, Howe, Haney &

Ryder, Jeffrey N. Haney, William R. Brown, Boornazian, Jensen & Garthe, Bruce Winkleman, Carroll, Burdick & McDonough, James B. Clapp, Horvitz & Levy, Barry R. Levy, Mitchell C. Tilner, Gibson, Dunn & Crutcher, Donald E. Sloan, Crosby, Heafey, Roach & May, Stephen G. Schrey, Louise M. McCabe, Gordon & Rees, Donald W. Rees, David C. Capell, Haasis, Pope & Correll, Kenneth E. Goates, Hancock, Rothert & Bunshoft, Richard L. Seabolt, Andrew K. Gordon, Brian A. Kelly, Laura G. Hill, Arthur J. Friedman, Hardin, Cook, Loper, Engel & Bergez, Ralph A. Lombardi, Hoge, Fenton, Jones & Appel, Robert Cullen, Jedeikin, Green, Meadows & Schneider, Nancy A. Aptekar, Lillick & Charles, Donald E. Dorfman, James Forbes, Long & Levit, Ira Goldberg, Luce, Forward, Hamilton & Scripps, Cathy L. Croshaw, Mitchell L. Lathrop, Lynberg & Watkins, R. Jeff Carlisle, Wendy E. Schultz, Misciagna & Colombatto, P. Richard Colombatto, Morris, Polich & Purdy, Steven M. Crane, Mike Colliau, J. Burleigh Arnold, Newton, Kastner & Remmel, Stephen Newton, O'Melveny & Myers, Martin S. Checov, Orrick, Herrington & Sutcliffe, Jeffrey S. White, Pruess, Walker & Shanagher, Gary T. Walker, Ropers, Majeski, Kohn, Bentley, Wagner & Kane, Ropers, Majeski, Kohn & Bentley, Richard K. Wilson, Sedgwick, Detert, Moran & Arnold, Roger Sleight, Jeffrey Miller, Skadden, Arps, Slate, Meagher & Flom, Irene Sullivan, Thomas R. Harrell, Wilson, Elser, Moskowitz, Edelman & Dicker, Debra S. Sturmer and Stephen P. Randall for Cross-defendants and Respondents.

Sinnott, Dito, Moura & Puebla, Randolph P. Sinnott, Wiley, Rein & Fielding, Laura A. Foggan, Joseph L. Ruby and Andrew L. Wexton as Amici Curiae on behalf of Cross-defendants and Respondents.

## OPINION

**MOSK, J.**—In this cause, we resolve two issues relating to standard commercial general liability insurance policies, which were formerly called comprehensive general liability insurance policies. The first question is whether site investigation expenses—broadly, expenses for determining the existence, nature, extent, effect, etc., of the discharge of hazardous substances at a location—may constitute defense costs that the insurer must incur in fulfilling its duty to defend. The second is whether defense costs may be allocated to the insured. As we shall explain, we conclude that, as to each, the answer is qualifiedly affirmative.

I

This is still another chapter in the yet-to-be-completed volume relating the story of Aerojet-General Corporation in Sacramento County. (See, e.g.,

*Mangini* v. *Aerojet-General Corp.* (1996) 12 Cal.4th 1087 [51 Cal.Rptr.2d 272, 912 P.2d 1220]; *Aerojet-General Corp.* v. *Transport Indemnity Insurance* (1993) 18 Cal.App.4th 996 [22 Cal.Rptr.2d 862]; *Mangini* v. *Aerojet-General Corp.* (1991) 230 Cal.App.3d 1125 [281 Cal.Rptr. 827]; *Aerojet-General Corp.* v. *Superior Court* (1989) 211 Cal.App.3d 216 [257 Cal.Rptr. 621].) Aerojet-General Corporation is, and has been, a leading manufacturer in the aerospace and defense markets. Throughout the course of its operations from the early 1950's into the 1980's, it discharged hazardous substances, including trichloroethylene, in an ongoing fashion at its Sacramento site and thereby caused pollution in and around that location as such substances spread onto the ground, into the groundwater, and beyond toward the American River.

In 1982, Transport Indemnity Company and Associated International Insurance Company (hereafter collectively Transport Indemnity) filed a complaint for declaratory relief in the Superior Court of San Mateo County, which was docketed under No. 262425, against, inter alios, numerous other insurers and their common insureds, Aerojet-General Corporation and its wholly owned subsidiary Cordova Chemical Company (hereafter collectively Aerojet), regarding the parties' rights and duties under various comprehensive general liability and other insurance policies.[1] It appears that what was stated above was already known or believed—that, throughout the course of its operations from the early 1950's into the 1980's, Aerojet had discharged hazardous substances in an ongoing fashion at its Sacramento site and had thereby caused pollution in and around that location resulting in continuous and/or progressively deteriorating bodily injury and/or property damage. In its complaint, Transport Indemnity sought declarations including that it was not obligated to provide, and Aerojet was not entitled to receive, either indemnification or defense.

Aerojet, which had been represented by independent counsel since about 1979, filed a cross-complaint for declaratory and other relief against, inter alios, Transport Indemnity and other of its insurers—which, for convenience's sake, will generally be referred to without differentiation as "the insurers."

Aerojet later filed an amended cross-complaint—the one operative here—against 54 insurers, under 245 comprehensive general liability and other

---

[1]As would subsequently appear, Aerojet's policies included "manuscript" as well as "standard" ones. Policies "are usually issued on standard forms containing terms and conditions drafted by the [insurer]. Often, the insurer is willing to modify or change the standard forms by 'endorsements' . . . . Sometimes, the policy issued is entirely nonstandard and drafted for the particular risk undertaken"—a so-called "manuscript" policy. (Croskey et al., Cal. Practice Guide: Insurance Litigation 1 (The Rutter Group 1997) ¶ 3:33, p. 3-6.)

insurance policies with periods incepting as early as 1950 and expiring as late as 1984, as to 3 actions brought by either the United States or the State of California and 35 actions brought by private parties, each of which was based on facts, alleged or otherwise disclosed, to the effect that, throughout the course of its operations from the early 1950's into the 1980's, Aerojet discharged hazardous substances in an ongoing fashion at its Sacramento site and thereby caused pollution in and around that location resulting in continuous and/or progressively deteriorating bodily injury and/or property damage. The private actions were various. The governmental ones were these: (1) an action instituted by the State of California against Aerojet in the Superior Court of Sacramento County in 1979 under authority of, inter alia, the Porter-Cologne Water Quality Control Act (Wat. Code, § 13000 et seq.), seeking relief including an injunction directing the company to undertake cleanup, abatement, and remedial work as to its pollution, and an order requiring the company to reimburse the state for the costs that the latter had, and would, incur in its own cleanup, abatement, and remedial work; (2) an action instituted by the United States against Aerojet in the United States District Court for the Eastern District of California in 1986 under authority of, inter alia, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (hereafter CERCLA) (42 U.S.C. § 9601 et seq.), seeking relief including an injunction directing the company to abate and remedy its pollution and its effects, and an order requiring the company to reimburse the United States for so-called "response costs," viz., the costs of removal and/or remediation (see 42 U.S.C. § 9601(25)),[2] which the United States had, and would, incur with regard thereto; and (3) a parallel CERCLA action instituted by the State of California against Aerojet on the same day and in the same court, seeking relief including an order requiring the company to reimburse the state for the "response costs" that the latter had, and would, incur; the federal and state CERCLA actions were consolidated. In its amended cross-complaint, Aerojet sought, among other things, a declaration that it was entitled to receive, and the insurers were obligated to provide, both indemnification and defense. In pertinent part, it alleged to the

---

[2]Under CERCLA, the terms "removal" and "remediation" bear the following meanings. "Removal" refers to the "cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release." (42 U.S.C. § 9601(23).) "Remediation" refers to "those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment." (Id., § 9601(24).)

effect that it had tendered the defense, but that the insurers had either refused or had accepted only under "unreasonable" reservations of rights.

In an opinion certified for publication, the Court of Appeal, First Appellate District, Division Five, granted a petition for writ of mandate submitted by Aerojet to compel the superior court to vacate an order granting a motion by the insurers for summary adjudication of certain issues and to enter a new and different order denying that motion. (*Aerojet-General Corp.* v. *Superior Court, supra*, 211 Cal.App.3d at pp. 220-238.) In effect, the superior court had summarily adjudicated that "response costs" under CERCLA, and similar costs under the Porter-Cologne Water Quality Control Act, could not constitute indemnification costs, i.e., expenses to resolve liability, that the insurers had to incur in fulfilling their duty to indemnify. The Court of Appeal concluded to the contrary. It therefore caused issuance of a peremptory writ of mandate as prayed. It did not consider whether costs of this sort could constitute defense costs, i.e., expenses to avoid or at least minimize liability.

Following entry of the dismissal without prejudice of the complaint by Transport Indemnity, the superior court effectively transformed Aerojet's cross-action against the insurers into an action in and of itself, ordering Aerojet to be designated "plaintiff" and not "cross-complainant" and the insurers to be designated "defendants" and not "cross-defendants."

The superior court subsequently ordered the action to be tried in phases. Phase I would be tried to the court, and would concern issues such as: (1) the authenticity of certain policies purportedly issued to Aerojet by some of the insurers; (2) the existence and wording of certain other policies missing in whole or in part; (3) the meaning of all such policies; and (4) related questions. Phase II would be tried to a jury, and would concern issues such as the application of the policies proved to the evidence presented in order to determine whether the insurers had a duty to indemnify Aerojet. Phase III would be tried to the same jury, and would concern issues such as: (1) the sum that Aerojet was entitled to receive from the insurers as a result of any duty to indemnify; (2) inasmuch as Aerojet's tender of the defense had by now been accepted by the insurers under certain reservations of rights, whether, and apparently in what amount, Aerojet was entitled to receive any additional payment for defense costs, and whether, and apparently in what amount, the insurers were entitled to obtain reimbursement for any such payment already provided; and (3) whether, and in what amount, the insurers were liable to Aerojet for so-called "bad faith" damages. Phase IV, if necessary, would be tried to the court, and would concern issues such as the allocation among the insurers of any sum determined to be owing to Aerojet.

At phase I, the superior court resolved issues concerning the existence, authenticity, wording, and meaning of various policies issued or purportedly issued to Aerojet by the insurers.

Specifically, in phase IA, the superior court made determinations as to existence, authenticity, and wording. From 1956 to 1984, it appears, Aerojet had various comprehensive general liability insurance policies and similar instruments that are pertinent here.

In phase IB, the superior court made determinations as to meaning. By way of background: Prior to 1966, in its insuring clause the standard comprehensive general liability insurance policy covered specified harm, such as bodily injury or property damage, caused by " 'accident.' " (Croskey et al., Cal. Practice Guide: Insurance Litigation 2, *supra*, ¶ 7:26, p. 7A-8 italics omitted.) In 1966, the form was revised in its insuring clause to cover specified harm caused by an " 'occurrence,' " which was defined as an " 'accident, including injurious exposure to conditions, which results during the policy period in' " harm of this sort " 'neither expected nor intended from the standpoint of the insured.' " (*Id.*, ¶ 7:28, p. 7A-9, italics omitted.) In 1973, the form was further revised: In its insuring clause, it continued to cover specified harm caused by an " 'occurrence,' " but now defined that term as an " 'accident, including continuous or repeated exposure to conditions, which results in' " harm of this sort " 'neither expected nor intended from the standpoint of the insured.' " (*Id.*, ¶ 7:29, p. 7A-9, italics omitted.) To return to the superior court's determinations: Aerojet's comprehensive general liability insurance policies and similar instruments largely conformed to the standard ones in applicable aspects. The phrase "neither expected nor intended" was express in the insuring clause of some, reflecting Insurance Code section 533, which states that "[a]n insurer is not liable for a loss caused by the wilful act of the insured . . . ." The phrase was implied in the insuring clause of the rest, through operation of the same provision. The phrase incorporated a subjective standard as to "intent" but, under *City of Carter Lake* v. *Aetna Cas. and Sur.* (8th Cir. 1979) 604 F.2d 1052, 1058-1059, an objective standard as to "expectation." If specified harm is "expected" or "intended" by the insured, it is effectively caused by a "wilful act" within the meaning of Insurance Code section 533, and hence outside of coverage. ▮▬▮▮▬▬ From 1976 to 1984, Aerojet's policies, which were issued by the Insurance Company of North America (hereafter INA), essentially took a form similar to that of a so-called "fronting" policy,[3] to the following effect: Although, in the body, it was stated that INA had a duty to indemnify Aerojet, by endorsement it was provided that (1)

---

[3] A "fronting" policy has been described as one "which does not indemnify" or, apparently, defend "the insured but which is issued to satisfy financial responsibility laws of various"

INA had a duty to make payments only beyond stated deductible amounts, which matched or approached indemnification limits, and (2) in case of Aerojet's default, INA had a duty to make payments within the stated deductible amounts and a corresponding right to obtain reimbursement therefor;[4] and although, in the body, it was stated that INA had a duty to defend Aerojet, by endorsement it was provided that Aerojet should pay its own defense costs—under which provision it was understood by Aerojet that it should defend itself.[5]

At phase II, Aerojet and the insurers presented evidence relevant to the issue of the duty to indemnify. In substance, it was established that, throughout the course of its operations from the early 1950's into the 1980's, Aerojet discharged hazardous substances in an ongoing fashion at its Sacramento site and thereby caused pollution in and around that location. The superior court charged the jury on the duty to indemnify. In the course of passing on various motions, it had previously determined that there was no such duty for periods before 1956 or after 1979 (specifically, after July 14, 1979). It submitted the question to the jury whether there was any such duty for any period from 1956 to 1979. In pertinent part, it instructed that "Aerojet has no insurance coverage if" specified harm "is expected or intended from the standpoint of Aerojet." It defined "expected" objectively to "denote[] that the actor knew *or should have known* that there was a substantial probability that certain consequences would result from his or her acts or omissions." By contrast, it defined "intended" subjectively to "denote[] that the actor desires the consequences of his act or believes that the consequences are substantially certain to follow." The jury proceeded to return a unanimous verdict determining that there was no duty to indemnify for any period from 1956 to 1979.

At phase III, the issues to be tried to the jury were limited to a single one pursuant to a stipulation between Aerojet and certain of the insurers other than INA: "What sums, if any, expended by Aerojet for [site] investigation are defense costs?" In the stipulation, Aerojet and the insurers agreed, in pertinent part, to the following effect: In shares determined among themselves, the insurers had paid, or would pay, as defense costs the expenses that Aerojet had incurred, or would incur, under the categories of "legal" and "legal support" through the final disposition of any appeal Aerojet would

jurisdictions "by guaranteeing to third persons who are injured that their claims against" the insured "will be paid." (*Columbia Casualty Co.* v. *Northwestern Nat. Ins. Co.* (1991) 231 Cal.App.3d 457, 471 [282 Cal.Rptr. 389].)

[4] "[I]f there is a conflict in meaning between an endorsement and the body of the policy, the endorsement controls." (*Continental Cas. Co.* v. *Phoenix Constr. Co.* (1956) 46 Cal.2d 423, 431 [296 P.2d 801, 57 A.L.R.2d 914].)

[5] See footnote 4, *ante.*

take from any ensuing judgment in the action; Aerojet and the insurers would litigate whether site investigation expenses were defense costs; Aerojet and the insurers would not litigate whether, or in what amount, the insurers were entitled to obtain reimbursement for Aerojet's "legal" or "legal support" expenses, or whether, or in what amount, the insurers were liable to Aerojet for bad faith damages; but, in the event of retrial following reversal of the judgment on appeal, the insurers could litigate the question of reimbursement and Aerojet could litigate the question of bad faith. In another stipulation, Aerojet and the insurers agreed as follows: Since 1979, Aerojet had incurred as defense costs "legal" expenses of $5,283,568, and "legal support" expenses of $5,634,149, for a total of $10,917,717; and, toward that amount, the insurers had paid $5,680,367, plus interest.

At the outset of phase III, the superior court ruled to the effect that, generally, site investigation expenses were not defense costs. It also ruled that defense costs could be allocated to the insured. Specifically, "Aerojet has held itself out to the world as insured by I.N.A." under its "fronting" comprehensive general liability insurance policies. "Aerojet has elected not to buy insurance for defense costs from 1976 on." "Under the court's equitable powers, Aerojet is responsible for a co-equal allocation of the defense cost."

Before the presentation of evidence at phase III, the superior court preinstructed the jury, in accordance with the ruling described above, as follows: "In this phase of the trial Aerojet seeks the costs it incurred to investigate the pollution at the Sacramento site as costs of defending the litigation filed against them by the governments and others. [¶] All sums that Aerojet paid, one, because of government orders or requests to investigate, clean up or remediate, or, [¶] two, because of Aerojet's agreement or commitment to perform the Aerojet investigation, cleanup or remediation are indemnity expenses, and therefore not recoverable as defense costs. [¶] Investigation costs, such as investigating the extent of the contamination or the viability of cleanup options and monitoring the spread of the wastes from the site, which were incurred as part of Aerojet's effort to clean up or remediate the site, are not considered defense costs. [¶] If the costs involved here were necessary to or part of Aerojet's effort to clean up and remediate the site, such costs are [not] defense costs, even if Aerojet's lawyers used information developed during the investigation to assist them in negotiating with the governments to limit Aerojet's obligations to clean up and to remediate. [¶] If any investigation costs did not relate to any of the purposes described above, but were incurred because they were specifically requested by a lawyer and were reasonable for the purpose of defending Aerojet in litigation, such investigation costs would be defense costs."

At phase III, Aerojet and the insurers presented evidence concerning Aerojet's site investigation expenses. By then, Aerojet had incurred such expenses in the amount of about $26,655,787.01. In part, it had conducted its site investigation against the private actions, which were ultimately about 38 in number. By around 1986, it had resolved all, or at least almost all, of these proceedings. After prevailing in a test case comprising three such matters, it settled all, or almost all, of the outstanding claims for about $450,000. In other part, it had conducted its site investigation against the state's action under the Porter-Cologne Water Quality Control Act, or more precisely, against various administrative orders or requests that had been made antecedent thereto. In yet other part, it had conducted its site investigation against the consolidated federal and state CERCLA actions. In 1989, it had become subject to a partial consent decree entered therein, which incorporated an agreement negotiated by the parties.[6] Although it denied any and all liability, it was required by the decree to "complete a Remedial Investigation/Feasibility Study" or "RI/FS," which was subject to oversight and review by the federal and state governments, in order "to determine the nature and extent of public health and environmental problems, if any, presented by the release or threat of release of hazardous substances at or from [its Sacramento site] and to develop and evaluate remedial alternatives so it can subsequently be determined which, if any, is necessary to remedy public health or environmental problems identified."[7] It expressly admitted that it had incurred its site investigation expenses, which it conceded included "costs . . . to investigate the extent of the contamination or the viability of cleanup option [sic] or the monitoring of the spread of waste from the site," "because of government orders or requests to investigate, cleanup or remediate" or "because of [its own] agreement or commitment to perform the investigation, cleanup, or remediation . . . ." But it also impliedly claimed that it had, or would have, incurred such expenses in order to avoid or at least minimize liability. In addition, it had assertedly incurred remediation expenses, more broadly defined, in the amount of about $35,240,495.44 and, more narrowly defined, in the amount of $30,454,495.44.

After the presentation of evidence at phase III, the superior court instructed the jury with language virtually identical to that of the preinstruction quoted above.

---

[6] A proposed consent decree, which incorporated an earlier agreement, had been lodged with the federal and state CERCLA complaints in 1986, and had subsequently been withdrawn.

[7] In the words of section 300.430(a)(2), which was subsequently added to title 40 of the Code of Federal Regulations: "The purpose of the remedial investigation/feasibility study (RI/FS) is to assess site conditions and evaluate alternatives to the extent necessary to select a remedy. Developing and conducting an RI/FS generally includes the following activities: project scoping, data collection, risk assessment, treatability studies, and analysis of alternatives." (55 Fed.Reg. 8666, 8846 (Mar. 8, 1990); accord, 40 C.F.R. § 300.430(a)(2) (1996).)

Following deliberations at phase III, the jury returned a unanimous verdict determining that Aerojet's site investigation expenses were not defense costs in any part.

Because the jury at phases II and III had determined that no sum was owing to Aerojet by the insurers, the superior court had no need to, and did not, proceed to phase IV, at which it would have resolved issues such as the allocation of any sum of this sort among the insurers.

The superior court then rendered what it denominated its "final judgment." Previously, it had entered various judgments and orders related thereto. Subsequently, it would enter an order on the taxing of costs.

Aerojet filed a notice of appeal from the final judgment. The appeal was docketed in the Court of Appeal, First Appellate District, under No. A057812, and was assigned to Division Five thereof. Previously, Aerojet had filed a notice of appeal from the various judgments and orders related to the final judgment. This had been docketed in the First Appellate District under No. A053808, and had been assigned to Division Five. Subsequently, Aerojet would file a notice of appeal from the order on the taxing of costs. This would be docketed in the First Appellate District under No. A059976, and would be assigned to Division Five.

In an opinion certified for partial publication, the Court of Appeal, having effectively consolidated all three appeals for consideration and decision, affirmed the "final judgment," the various judgments and orders related thereto, and the order on the taxing of costs, except as indicated below.

In part I of its discussion, which it did not certify for publication, the Court of Appeal reviewed phase I of the trial. Following *Shell Oil Co.* v. *Winterthur Swiss Ins. Co.* (1993) 12 Cal.App.4th 715, 743-748 [15 Cal.Rptr.2d 815], which it deemed to have been approved on this point in *Montrose Chemical Corp.* v. *Superior Court* (1993) 6 Cal.4th 287, 304-305 [24 Cal.Rptr.2d 467, 861 P.2d 1153], it concluded, inter alia, that the superior court erred in its determination, based on *City of Carter Lake* v. *Aetna Cas. and Sur., supra,* 604 F.2d 1052, that the phrase "neither expected nor intended," which it held to be express in the insuring clause of some of Aerojet's comprehensive general liability insurance policies and similar instruments and implied in the insuring clause of the rest, incorporated an objective standard as to "expectation," rather than a subjective one.

In part II of its discussion, which it also did not certify for publication, the Court of Appeal reviewed phase II of the trial. In conformity with its holding

that the phrase "neither expected nor intended" incorporated a subjective standard as to "expectation," it concluded, inter alia, that the superior court erred by instructing the jury to the effect that "Aerojet has no insurance coverage if" it "expected" specified harm, and that it "expected" such harm if it "knew *or should have known* that there was a substantial probability that certain consequences would result from [its] acts or omissions." (Italics added.) But applying the harmless error rule of section 13 of article VI of the California Constitution, as construed in *Soule* v. *General Motors Corp.* (1994) 8 Cal.4th 548, 573-581 [34 Cal.Rptr.2d 607, 882 P.2d 298], it concluded that the superior court did not prejudice Aerojet. In substance, it determined: The issue whether Aerojet "expected" that it would cause pollution at and around its Sacramento site focused on whether it "knew," from the very commencement of its operations, that "there was a substantial probability" that adverse consequences would result from its acts or omissions; that Aerojet did in fact possess knowledge of this sort was supported by "overwhelming" evidence.

In part III of its discussion, which alone it certified for publication, the Court of Appeal reviewed phase III of the trial.

Specifically, in part III, the Court of Appeal concluded, inter alia, that the superior court erred by instructing the jury to the effect that Aerojet's site investigation expenses were not defense costs to the extent that they were linked to orders or requests by the United States or the State of California. It held in substance as follows: Generally, site investigation expenses by an insured are defense costs to the extent that they are reasonable and necessary to avoid or at least minimize liability; *AIU Ins. Co.* v. *Superior Court* (1990) 51 Cal.3d 807, 818-843 [274 Cal.Rptr. 820, 799 P.2d 1253] is not to the contrary, standing as it does only for the proposition that certain site investigation expenses by a third party—such as those included within "response costs" by the United States under CERCLA—may be indemnification costs to the extent that they must be reimbursed by the insured and resolve liability for specified harm; nevertheless, under the approach of the United States District Court in *Fireman's Fund Ins. Companies* v. *Ex-Cell-O Corp.* (E.D.Mich. 1992) 790 F.Supp. 1318, 1338 (hereafter sometimes *Ex-Cell-O I*), and *Fireman's Fund Ins. Companies* v. *Ex-Cell-O Corp.* (E.D.Mich. 1992) 790 F.Supp. 1339, 1346 (hereafter sometimes *Ex-Cell-O II*), there is a presumption that an insured's site investigation expenses in connection with a Remedial Investigation/Feasibility Study or RI/FS responding to an order or request by the United States for specific information under CERCLA are not defense costs, but that presumption may be rebutted by the insured by showing that the site investigation expenses in question were reasonable and necessary to avoid or at least minimize liability and

would have been incurred even in the absence of such order or request; the general rule applies to Aerojet's site investigation expenses against (1) the private actions, (2) the state's action under the Porter-Cologne Water Quality Control Act and the various administrative orders or requests antecedent thereto, which were determined not to have sought site investigation, and (3) as qualified below, against the federal and state CERCLA actions; the exception applies to Aerojet's site investigation expenses in connection with the Remedial Investigation/Feasibility Study responding to any order or request by the federal or apparently the state government for specific information under CERCLA. Applying the harmless error rule, it concluded that the superior court did indeed prejudice Aerojet: The erroneous instruction, which was given at the commencement of this phase as well as at its conclusion, effectively prevented Aerojet from presenting available evidence that had a tendency in reason to prove that its site investigation expenses were reasonable and necessary to avoid or at least minimize liability; moreover, it provided the jury with the wrong law to apply to such evidence as Aerojet and the insurers had in fact presented.

In part III, the Court of Appeal also concluded that the superior court did not err in ruling that defense costs could be allocated to the insured. It held to this effect: because Aerojet agreed that it would pay its own defense costs under the "fronting" comprehensive general liability insurance policies issued by INA from 1976 to 1984, it "should now carry [its] fair share of the burden" pro rata based on the time of noninsurance within the time as a whole.

The Court of Appeal denied a petition for rehearing by Aerojet. On its own motion, it modified part II of its opinion, which was unpublished, simply to add a single sentence at the very end in order to "note the obvious—that [its] decision in [this part] is based on the *specific* facts of *this* case." (Italics in original.)

On separate petitions by Aerojet and the insurers, we granted review. Pursuant to rule 29.2(b) of the California Rules of Court, we subsequently specified the issues to be argued as indicated in the introduction.

## II

The issues to be resolved are whether, under standard comprehensive or commercial general liability insurance policies, site investigation expenses may constitute defense costs that the insurer must incur in fulfilling its duty to defend, and whether, under such policies, defense costs may be allocated

to the insured. We shall first speak generally about the policies in question and then turn to address each of the questions in turn.[8]

A

█ Standard comprehensive or commercial general liability insurance policies are contracts between an insurer and an insured: In each, the insurer makes promises, and the insured pays premiums, the one in consideration for the other, against the risk of loss. (E.g., *Buss* v. *Superior Court* (1997) 16 Cal.4th 35, 44-45 [65 Cal.Rptr.2d 366, 939 P.2d 766].)

In pertinent part, standard comprehensive or commercial general liability insurance policies provide that the insurer has a duty to indemnify the insured for those sums that the insured becomes legally obligated to pay as damages for a covered claim. (E.g., *Buss* v. *Superior Court; supra*, 16 Cal.4th at p. 45.) By definition, this duty entails the payment of money (e.g., *id.* at p. 46), which is expressly limited in amount (see Croskey et al., Cal. Practice Guide: Insurance Litigation 2, *supra*, ¶ 7:354, p. 7A-76), in order to resolve liability (e.g., *Buss* v. *Superior Court, supra*, 16 Cal.4th at p. 46). It is not narrowly confined to money that the insured must give under law as compensation to third parties, but may also include money that the insured must itself expend in equity in order to provide relief of the same sort. (*AIU Ins. Co.* v. *Superior Court, supra*, 51 Cal.3d at pp. 818-843.) It runs to claims that are actually covered, in light of the facts proved. (E.g., *Buss* v. *Superior Court, supra*, 16 Cal.4th at pp. 45-46.) It arises only after liability is established and as a result thereof. (E.g., *id.* at p. 46; see *Montrose Chemical Corp.* v. *Admiral Ins. Co., supra*, 10 Cal.4th at p. 659, fn. 9.) It is triggered if specified harm is caused by an included occurrence,[9] so long as at least some such harm results within the policy period. (*Montrose Chemical Corp.* v. *Admiral Ins. Co., supra*, 10 Cal.4th at pp. 669-673.) It extends to all

---

[8]The County of San Bernardino et al., which have been granted leave to appear as amici curiae supporting Aerojet's position, have submitted a request for judicial notice of the following commentaries: (1) Elliott, *The New Comprehensive General Liability Policy* (American Management Association Reprint 1966); and (2) Obrist, *The New Comprehensive General Liability Insurance Policy—A Coverage Analysis* (Defense Research Inst. Monograph 1966). We deny the request. We may take judicial notice only of matter that is "authorized or required by law." (Evid. Code, § 450.) The indicated commentaries are not such. (See *id.*, §§ 451, 452.) They may nevertheless be consulted for whatever assistance they may furnish. So they were in the past, in decisions including *Montrose Chemical Corp.* v. *Admiral Ins. Co.* (1995) 10 Cal.4th 645, 671-672 [42 Cal.Rptr.2d 324, 913 P.2d 878]. So they will be now as well.

[9]As stated, prior to 1966, in its insuring clause the standard comprehensive general liability insurance policy covered specified harm, such as bodily injury or property damage, caused by "accident" rather than by an "occurrence." (Croskey et al., Cal. Practice Guide: Insurance Litigation 2, *supra*, ¶ 7:26, p. 7A-8.) As pertinent here, the difference in words does not reflect any difference in substance. (See *id.*, ¶¶ 7:25 to 7:32, pp. 7A-8 to 7A-10.)

specified harm caused by an included occurrence, even if some such harm results beyond the policy period. (See *id.* at p. 686.) In other words, if specified harm is caused by an included occurrence and results, at least in part, within the policy period, it perdures to all points of time at which some such harm results thereafter.[10] To illustrate by a hypothetical similar to the present case: Insurer has a duty to indemnify Insured for those sums that Insured becomes legally obligated to pay as damages for property damage caused by its discharge of hazardous substances, up to a limit of $1 million. Insured discharges such a substance. It thereby causes property damage to Neighbor's land, in the amount of $100,000 (determined by the cost of returning the soil to its original condition), within the policy period of year 1. It causes further damage of this sort as the substance spreads under the surface, in the amount of $100,000 annually, in year two through year thirty. Insured must pay Neighbor $3 million in damages under judgment. Insurer must pay Insured the limit of $1 million for indemnification.

■ Standard comprehensive or commercial general liability insurance policies also provide that the insurer has a duty to defend the insured in any

---

[10]In *Montrose Chemical Corp.* v. *Admiral Ins. Co.*, *supra*, 10 Cal.4th 645, we made the point plain. Hence, the contrary premise on which Justice Chin rests his concurring and dissenting opinion collapses as without support. In *Montrose*, we noted, and reaffirmed, the "settled rule" of the case law that "an insurer on the risk when continuous or progressively deteriorating [property] damage or [bodily] injury first manifests itself remains obligated to indemnify the insured *for the entirety of the ensuing damage or injury.*" (*Id.* at p. 686, italics added.) In *Armstrong World Industries, Inc.* v. *Aetna Casualty & Surety Co.* (1996) 45 Cal.App.4th 1 [52 Cal.Rptr.2d 690], the Court of Appeal observed that, in *Montrose*, we "relied upon existing case law holding that coverage for a manifested loss is not terminated by the expiration of the policy; coverage continues until the damage is complete." (*Id.* at p. 50.) Citing such case law itself, it explained: "[T]he event which triggers an insurance policy's coverage does not define the extent of the coverage. Although a policy is triggered only if [bodily injury or] property damage takes place 'during the policy period,' once a policy is triggered, the policy obligates the insurer to pay 'all sums' which the insured shall become liable to pay as damages for bodily injury or property damage. The insurer is responsible for the full extent of the insured's liability . . . , not just for the part of the [injury or] damage that occurred during the policy period." (*Id.* at p. 105.) In light of the foregoing, commentators have soundly stated: "Courts *reject* the argument that [an] insurer should only be responsible for [injury or] damage that took place during its policy period . . . ." (Croskey et al., Cal. Practice Guide: Insurance Litigation 2, *supra*, ¶ 8:73.10, p. 8-19, italics in original.)

In *Montrose*, we also made plain that "successive" insurers "on the risk when continuous or progressively deteriorating [property] damage or [bodily] injury first manifests itself" are separately and independently "obligated to indemnify the insured": "[W]here successive . . . policies have been purchased, bodily injury and property damage that is continuing or progressively deteriorating throughout more than one policy period is potentially covered by all policies in effect during those periods." (*Montrose Chemical Corp.* v. *Admiral Ins. Co.*, *supra*, 10 Cal.4th at pp. 686-687.) The successive insurers are not "jointly and severally liable." (*Id.* at p. 681, fn. 19, italics omitted.) Rather, "[a]llocation of the cost of indemnification" among such insurers "requires application of principles of contract law to the express terms and limitations of the various policies" (*ibid.*) and, in their absence, "equitable considerations" (*id.* at p. 687).

action brought against the insured seeking damages for a covered claim. (E.g., *Buss* v. *Superior Court, supra,* 16 Cal.4th at p. 45.) By definition, the duty entails the rendering of a service, viz., the mounting and funding of a defense (e.g., *id.* at p. 46), which is not limited, expressly or otherwise (see *Travelers Ins. Co.* v. *Lesher* (1986) 187 Cal.App.3d 169, 191 [231 Cal.Rptr. 791], disapproved on other points, *Buss* v. *Superior Court, supra,* 16 Cal.4th at pp. 50, fn. 12, & 52, fn. 14; cf. Croskey et al., Cal. Practice Guide: Insurance Litigation 2, *supra,* ¶ 7:647, p. 7B-32 [speaking generally and without specific reference to such policies]), in order to avoid or at least minimize liability (see *Gray* v. *Zurich Insurance Co.* (1966) 65 Cal.2d 263, 279 [54 Cal.Rptr. 104, 419 P.2d 168]). As such, it requires the undertaking of reasonable and necessary efforts for that purpose (see *ibid.*), including investigation (see *Pacific Indem. Co.* v. *Universal etc. Ins. Co.* (1965) 232 Cal.App.2d 541, 543-544 [43 Cal.Rptr. 26]). It also requires the incurring of reasonable and necessary costs to that end (see *Travelers Ins. Co.* v. *Lesher, supra,* 187 Cal.App.3d at p. 191), including investigative expenses (see *Pacific Indem. Co.* v. *Universal etc. Ins. Co., supra,* 232 Cal.App.2d at pp. 543-544). It runs to claims that are merely potentially covered, in light of facts alleged or otherwise disclosed. (E.g., *Buss* v. *Superior Court, supra,* 16 Cal.4th at p. 46.) It arises as soon as tender is made (e.g., *ibid.*), before liability is established and apart therefrom (e.g., *Montrose Chemical Corp.* v. *Admiral Ins. Co., supra,* 10 Cal.4th at p. 659, fn. 9). It is discharged when the action is concluded. (E.g., *Buss* v. *Superior Court, supra,* 16 Cal.4th at p. 46.) It may be extinguished earlier, if it is shown that no claim can in fact be covered. (E.g., *ibid.*) If it is so extinguished, however, it is extinguished only prospectively and not retroactively: Before, the insurer had a duty to defend; after, it does not have a duty to defend further. (E.g., *ibid.*) It is triggered if specified harm may possibly have been caused by an included occurrence, so long as at least some such harm may possibly have resulted within the policy period. (Cf. *Montrose Chemical Corp.* v. *Admiral Ins. Co., supra,* 10 Cal.4th at pp. 669-673 [holding to such effect as to the duty to indemnify].) It extends to all specified harm that may possibly have been caused by an included occurrence, even if some such harm may possibly have resulted beyond the policy period. (Cf. *id.* at p. 686 [holding to such effect as to the duty to indemnify].) In other words, if specified harm may possibly have been caused by an included occurrence and may possibly have resulted, at least in part, within the policy period, it perdures to all points of time at which some such harm may possibly have resulted thereafter.[11] To illustrate again by a hypothetical: Insurer has a duty to defend Insured as to a claim for damages for property damage caused by its discharge of hazardous substances brought by Neighbor. Insured may possibly have discharged such a substance. It thereby may possibly have caused property damage to

---

[11]See footnote 10, *ante.*

Neighbor's land within the policy period of year one. It may possibly have caused further damage as the substance may possibly have spread under the surface in year two through year thirty. Insurer must defend Insured as to the claim in its entirety.

■ It is plain that the insurer's duty to defend is broader than its duty to indemnify. (E.g., *Buss* v. *Superior Court, supra*, 16 Cal.4th at p. 46.) But it is also plain that it is not unlimited. (E.g., *ibid.*) It extends beyond claims that are actually covered to those that are merely potentially so, but no further. (E.g., *ibid.*)

Thus, in an action wherein all the claims are at least potentially covered because they may possibly embrace some triggering harm of the specified sort within the policy period caused by an included occurrence, the insurer has a duty to defend. (*Buss* v. *Superior Court, supra*, 16 Cal.4th at pp. 46-47.) "This obligation is express in the policy's language. It rests on the fact that the insurer has been paid premiums by the insured for a defense. 'The rule is grounded in basic principles of contract law.' [Citation.] The duty to defend is contractual. [Citations.] 'An insurer contracts to pay the entire cost of defending . . . claim[s]' that are at least potentially covered." (*Id.* at p. 47.)

By contrast, in an action wherein none of the claims is even potentially covered because it does not even possibly embrace any triggering harm of the specified sort within the policy period caused by an included occurrence, the insurer does not have a duty to defend. (*Buss* v. *Superior Court, supra*, 16 Cal.4th at p. 47.) "This freedom is implied in the policy's language. It rests on the fact that the insurer has not been paid premiums by the insured for a defense. This 'rule' too 'is grounded in basic principles of contract law.' [Citation.] As stated, the duty to defend is contractual. 'The insurer has not contracted to pay defense costs' for claims that are not even potentially covered." (*Ibid.*)

It follows that, in a "mixed" action, in which at least one of the claims is at least potentially covered and at least one of the claims is not, the insurer does not have a duty to defend the action in its entirety *arising out of contract*: It "has a duty to defend as to the claim[] that [is] at least potentially covered, having been paid premiums by the insured therefor, but does not have a duty to defend as to [the claim] that [is] not, having not been paid therefor." (*Buss* v. *Superior Court, supra*, 16 Cal.4th at pp. 47-48.)

Nevertheless, the insurer has a duty to defend the entire "mixed" action *imposed by law in support of the policy*: "To defend meaningfully, [it] must

defend immediately. [Citation.] To defend immediately, it must defend entirely." (*Buss* v. *Superior Court, supra*, 16 Cal.4th at pp. 48-49.)

It is manifest that this analysis applies, as it were, not only between *claims* but also between *parts* of a single claim.[12]

Thus, when all the parts of a claim are at least potentially covered because each may possibly embrace some triggering harm of the specified sort within the policy period caused by an included occurrence, the insurer has a duty to defend. It has " 'contract[ed] to pay the entire cost of defending' " a claim of this sort. (*Buss* v. *Superior Court, supra*, 16 Cal.4th at p. 47.)

By contrast, when none of the parts of a claim is even potentially covered because it does not even possibly embrace any triggering harm of the specified sort within the policy period caused by an included occurrence, the insurer does not have a duty to defend. It " 'has not contracted to pay defense costs' " for a claim of this sort. (*Buss* v. *Superior Court, supra*, 16 Cal.4th at p. 47.)

It follows that, as to a "mixed" claim, in which at least one of the parts is at least potentially covered and at least one of the parts is not, the insurer does not have a *contractual* duty to defend the claim in its entirety.

Nevertheless, the insurer has a *prophylactic* duty to defend the entire "mixed" claim. That is because to defend meaningfully, it must defend immediately, and to defend immediately, it must defend entirely.

### B

 The first issue on review concerns whether, under standard comprehensive or commercial general liability insurance policies, site investigation expenses may constitute defense costs that the insurer must incur in fulfilling its duty to defend.

 The insurer has a duty to defend. In fulfilling its duty, it must undertake reasonable and necessary efforts to avoid or at least minimize liability. To that end, it must incur reasonable and necessary costs. All this it must do from as early as tender of the defense through as late as conclusion of the action.

 It follows that the insured's site investigation expenses constitute defense costs that the insurer must incur in fulfilling its duty to defend if,

---

[12]*Pace* Justice Kennard, who in her concurring and dissenting opinion essentially adheres to views that we previously considered and found wanting. (Compare *Buss* v. *Superior Court, supra*, 16 Cal.4th at pp. 44-49 with *id.* at pp. 62-66 (dis. opn. of Kennard, J.).)

and only if, the following requirements are satisfied. First, the site investigation must be conducted within the temporal limits of the insurer's duty to defend, i.e., between tender of the defense and conclusion of the action. Second, the site investigation must amount to a reasonable and necessary effort to avoid or at least minimize liability. Third and final, the site investigation expenses must be reasonable and necessary for that purpose.

Thus, if and to the extent that the insured's site investigation is conducted within the temporal limits of the insurer's duty to defend and amounts to a reasonable and necessary effort to avoid or at least minimize liability, the related site investigation expenses may possibly be defense costs that the insurer must incur in fulfilling its duty to defend. If and to the extent that these site investigation expenses are reasonable and necessary for that purpose, they are in fact defense costs that the insurer must incur in fulfilling its duty to defend; but if and to the extent that they are not, they are not. By contrast, if and to the extent that the site investigation is not conducted within the temporal limits of the insurer's duty to defend or does not amount to a reasonable and necessary effort to avoid or at least minimize liability, the related site investigation expenses cannot even possibly be defense costs that the insurer must incur in fulfilling its duty to defend.

Not to the contrary is *AIU Ins. Co.* v. *Superior Court, supra,* 51 Cal.3d 807. As pertinent here, that decision stands only for the proposition that certain site investigation expenses by a third party—such as those included within "response costs" by the United States under CERCLA—may be indemnification costs to the extent that they must be reimbursed by the insured and resolve liability for specified harm. (*Id.* at pp. 824-843.) ██ ██ It simply does not hold or state that such expenses by an insured are not defense costs to the extent that they are reasonable and necessary to avoid or at least minimize liability.[13] In *AIU Ins. Co.* v. *Superior Court,* we construed standard policy language covering indemnification costs, i.e., "sums which [the insured] becomes 'legally obligated' to pay as 'damages' . . . because of '[bodily injury or] property damage.' " (*Id.*

---

[13]At least as a general matter, under the analysis presented in the text, the costs that the insurer must incur in fulfilling its duty to indemnify and the costs that it must incur in fulfilling its duty to defend are mutually exclusive. Indemnification costs, i.e., expenses to resolve liability, are expressly limited in the policy. They arise after the insured's liability is established and as a result thereof. That is because indemnification presupposes that such liability has actually been established in the past. (See *Montrose Chemical Corp.* v. *Admiral Ins. Co., supra,* 10 Cal.4th at p. 659, fn. 9.) By contrast, defense costs, i.e., expenses to avoid or at least minimize liability, are not limited by the policy, expressly or otherwise, but impliedly extend to all such expenses as are reasonable and necessary. They arise before the insured's liability is established and apart therefrom. That is because defense presupposes that such liability may possibly be established in the future. (See *ibid.*) Thus, at least generally, the same costs cannot be both indemnification costs and defense costs.

at p. 824.) We concluded that the phrase "legally obligated" means required of the insured, whether at law or in equity. (*Id.* at pp. 824-825.) We further concluded that the term "damages" comprehends the insured's costs of providing the relief required, whether such costs are paid by the insured itself or reimbursed by it to a third party. (*Id.* at pp. 825-842.) We then concluded that the phrase "property damage" refers to specified harm that the insured has caused. (*Id.* at pp. 842-843.) It is manifest that site investigation expenses by the insured may *not* be indemnification costs, i.e., "sums which [the insured] becomes 'legally obligated' to pay as 'damages' . . . because of '[*bodily injury or*] *property damage.*' " For example, such expenses may be required of the insured under CERCLA even before it has been proved to have caused specified harm (see, e.g., 42 U.S.C. § 9604(a)(1) [reaching "*potentially* responsible part[ies]" (italics added)])—and even if it is subsequently proved not to have done so (see *American Bumper* v. *Hartford Ins.* (1996) 452 Mich. 440, 443-447, 460-463 [550 N.W.2d 475, 477-479, 485-486]).

Whether the insured's site investigation expenses are defense costs that the insurer must incur in fulfilling its duty to defend must be determined objectively, and not subjectively from the viewpoint of either the insurer or the insured.

Specifically, whether the site investigation is conducted by the insured within the temporal limits of the insurer's duty to defend must be assessed under an objective standard. What matters is whether the site investigation actually occurs between tender of the defense and conclusion of the action, not whether it is honestly believed to occur.

Whether the insured's site investigation amounts to a reasonable and necessary effort to avoid or at least minimize liability must also be assessed under an objective standard. What matters here is whether the site investigation would be conducted against liability by a reasonable insured under the same circumstances. Were it not, the question would require a discernment of motive. Why is the insured conducting the site investigation at issue? to resist liability? for that reason and some other? for a reason altogether different? "Motive, however, is 'hard . . . to discern.' " (*Buss* v. *Superior Court, supra*, 16 Cal.4th at p. 52, fn. 14, quoting *Della Penna* v. *Toyota Motor Sales, U.S.A., Inc.* (1995) 11 Cal.4th 376, 405 [45 Cal.Rptr.2d 436, 902 P.2d 740] (conc. opn. of Mosk, J.).) "That is true . . . [as to] an individual: a person's mind and heart typically reveal themselves and conceal themselves at one and the same time. It is truer still . . . [as to] a group of individuals: many minds and hearts are then involved, and they cannot simply be added up. And, of course, it is truest . . . [as to] a corporation or

similar entity"—like the typical commercial or governmental insured: "the 'mind' and 'heart' of such a one is purely fictive." (*Della Penna* v. *Toyota Motor Sales, U.S.A., Inc., supra*, 11 Cal.4th at p. 405 (conc. opn. of Mosk, J.); accord, *Buss* v. *Superior Court, supra*, 16 Cal.4th at p. 52, fn. 14.)

Lastly, whether the insured's site investigation expenses are reasonable and necessary to avoid or at least minimize liability must be assessed under an objective standard as well. What matters here is whether the site investigation expenses would be incurred against liability by a reasonable insured under the same circumstances. Were it not, this question too would require a discernment of motive. Why is the insured incurring the site investigation expenses at issue? to resist liability? for that reason and some other? for a reason altogether different? "Motive," again, "is 'hard . . . to discern.' " (*Buss* v. *Superior Court, supra*, 16 Cal.4th at p. 52, fn. 14.)

All this is true even in the general context of a governmental request or order for the insured to conduct a site investigation and/or to incur site investigation expenses. Otherwise, the questions whether the insured's site investigation is reasonable and necessary to avoid or at least minimize liability and whether its site investigation expenses are reasonable and necessary for that purpose would require a difficult discernment of motive. Why is the insured conducting the site investigation in question and why is it incurring the site investigation expenses at issue? to resist liability? to satisfy the government without regard to consequences? for an altogether different reason? or, most plausibly, *both* to resist liability *and* to satisfy the government?

All this is also true even in the specific context of an order or request for a Remedial Investigation/Feasibility Study or RI/FS under CERCLA by the United States. The federal government may require or ask for such a study. (See 42 U.S.C. § 9604(a)(1).) It may conduct the study itself. (See *ibid.*) If it does, it may compel the insured to reimburse it for the cost thereof. (42 U.S.C. § 9607(a).) The insured may be allowed to conduct the study if it is determined to be qualified to do so, if it is subjected to federal government oversight and review, and if it agrees to make reimbursement for the cost of such oversight and review. (42 U.S.C. § 9604(a)(1).) It is well known that, by conducting the study itself, the insured may be able to avoid or at least minimize liability—both for the costs of the study and for any costs subsequent thereto (see, e.g., *Aetna Cas. and Sur. Co., Inc.* v. *Pintlar Corp.* (9th Cir. 1991) 948 F.2d 1507, 1517; see also *AIU Ins. Co.* v. *Superior Court, supra*, 51 Cal.3d at p. 837 [stating that, "[a]s courts and commentators have recognized, government cleanup efforts [under CERCLA] are generally considerably more expensive than cleanups performed by" the insured]).

Here too, although the insured's motives may be hard to discern, they are most plausibly both to resist liability and to satisfy the government.

Finally, on the question whether the insured's site investigation expenses are defense costs that the insurer must incur in fulfilling its duty to defend, there arises the issue of the burden of proof.

In the general case, it is the insured that must carry the burden of proof on the existence, amount, and reasonableness and necessity of the site investigation expenses as defense costs, and it must do so by the preponderance of the evidence. "Evidence Code section 500 provides that, generally, a party desiring relief must carry the burden of proof thereon." (*Buss* v. *Superior Court, supra*, 16 Cal.4th at p. 53.) Further, "Evidence Code section 115 . . . provides that the burden of proof that is generally applicable is proof by a preponderance of the evidence. Of course, this burden is the 'ordinary' one for civil actions. [Citations.] It is applicable to contractual causes of action." (*Buss* v. *Superior Court, supra*, 16 Cal.4th at pp. 53-54.)

By contrast, in the exceptional case, wherein the insurer has breached its duty to defend, it is the insured that must carry the burden of proof on the existence and amount of the site investigation expenses, which are then presumed to be reasonable and necessary as defense costs, and it is the insurer that must carry the burden of proof that they are in fact unreasonable or unnecessary. (Accord, *Fireman's Fund Ins. Companies* v. *Ex-Cell-O Corp.* (*Ex-Cell-O II*), *supra*, 790 F.Supp. at p. 1346 [*semble*, but apparently intermingling the presumption affecting the burden of proof and the presumption affecting the burden of producing evidence]; cf. *Isaacson* v. *California Ins. Guarantee Assn.* (1988) 44 Cal.3d 775, 791 [244 Cal.Rptr. 655, 750 P.2d 297] [concluding that, "if an insurer wrongfully fails to provide . . . a defense, and the insured then settles the claim, . . . [i]n a later action against the insurer for reimbursement" "the insured is given the benefit of an evidentiary presumption," later expressly held to affect the burden of proof (*Xebec Development Partners, Ltd.* v. *National Union Fire Ins. Co.* (1993) 12 Cal.App.4th 501, 549 [15 Cal.Rptr.2d 726]) that the insured was indeed liable on, and in the amount of, the settled claim, so long as the settlement was reasonable].) As is ordinary in civil actions generally and for contractual claims in particular, the insurer and the insured must each carry its burden of proof by a preponderance of the evidence.

It follows that Aerojet's site investigation expenses may constitute defense costs that the insurers must incur in fulfilling their duty to defend. From 1956 to about 1975, Aerojet had largely typical comprehensive general liability insurance policies and similar instruments, covering specified harm

including bodily injury and/or property damage, that were issued by various insurers. From 1976 to 1984, it had "fronting" policies of this sort that were issued by INA. The record on appeal shows that Aerojet's site investigation may have been conducted within the temporal limits of each insurer's duty to defend. It also shows that the site investigation, at least in part, may have amounted to a reasonable and necessary effort to avoid or at least minimize liability. It finally shows that the site investigation expenses, at least in part, may have been reasonable and necessary for that purpose. Whether and to what extent they actually were such are issues to be resolved on retrial.

The insurers argue against the foregoing conclusion. They fail to persuade.

For example, the insurers imply that site investigation and site investigation expenses are peculiar to hazardous substance discharge claims. That may be true. But it does not mean, as they apparently suppose, that site investigation cannot amount to a reasonable and necessary effort to avoid or at least minimize liability or that site investigation expenses cannot be reasonable and necessary for that purpose. Factually, a hazardous substance discharge claim may be sui generis. Legally, however, it is not unique. The insurers maintain that the governmental actions were different from others: They were not litigated, they did not seek a judgment; rather, they were negotiated, they aimed at settlement. The governmental actions may have been unlike others in degree. But not in kind. Many actions involve negotiation rather than litigation; many look toward settlement rather than judgment. What matters is the legal "essence," as it were, of any site investigation and any site investigation expenses, and not their factual "accidents."

In addition, the insurers assert that the insured will have carte blanche to pronounce any "site investigation expenses" to be defense costs, provided only that the insured entertains an honest belief—or persuasively says it entertains an honest belief—that they are. Not so. The standard is objective, not subjective.

Further, the insurers imply that site investigation expenses may be included within "response costs" under CERCLA. That may be true. But it does not mean, as they apparently suppose, that site investigation expenses cannot be defense costs. For instance, the insured's site investigation expenses for identifying the hazardous substance discharged may be "response costs" insofar as they promote removal and remediation, by enabling it to determine how to neutralize the substance in question. They may also be defense costs insofar as they are reasonable and necessary to avoid or at least minimize liability, by making it possible for it to show that it was not in fact

the source of the discharge. Any assumption that site investigation expenses cannot do double duty is unsupported and hence must be rejected. So too any similar assumption about the site investigation itself. If site investigation expenses must be incurred by the insurer in fulfilling its duty to defend the insured, they must be incurred. The insurer gives, and the insured gets, what they bargained for. Even if the insured may happen to derive some added benefit, the insurer does not shoulder any added burden. The insurer may not be heard to complain. (Cf. *Domtar, Inc.* v. *Niagara Fire Ins. Co.* (Minn. 1997) 563 N.W.2d 724, 738-739 [applying Minnesota law, but speaking generally: That the same costs may do double duty as both indemnification costs and defense costs does not mean that they do not do duty as the latter as well as the former].)[14]

Also, the insurers assume that site investigation expenses cannot be defense costs to the extent that the underlying site investigation is ordered or requested by the federal or state government or, it seems, by any other person or entity. Their premise is, apparently, that the effort undertaken by a party in defending itself must be voluntary, as for example initiated and controlled by the party itself. It is unsound. (See *Hi-Mill Mfg. Co.* v. *Aetna Cas. & Sur. Co.* (E.D.Mich. 1995) 884 F.Supp. 1109, 1116-1117 [applying Michigan law, but speaking generally]; *American Bumper* v. *Hartford Ins,* *supra,* 452 Mich. at pp. 460-463 [550 N.W.2d at pp. 485-486 [same]; *General Acc. Ins. Co.* v. *State Dept. of Environ., supra,* 143 N.J. at p. 476 [672 A.2d at pp. 1161-1162] [applying New Jersey law, but speaking generally].) What matters is what is done, not why. All the same: Typically, the effort undertaken by a defendant in responding to a plaintiff's interrogatories is not voluntary in any real sense: It is initiated at the plaintiff's request and is controlled by the plaintiff's threat of a motion to compel further responses. But, typically, the expenses of responding to interrogatories may indeed be defense costs. The result is unaffected by the fact that a partial consent decree was entered in the consolidated federal and state CERCLA actions, under which Aerojet was required to "complete a Remedial Investigation/Feasibility Study" or "RI/FS," which was subject to oversight and review by the federal and state governments. (See *American Bumper* v. *Hartford Ins, supra,* 452 Mich. at pp. 460-463 [550 N.W.2d at pp. 485-486] [applying Michigan law, but speaking generally].) ■ "To be sure, consent decrees bear some of the earmarks of judgments entered after litigation. At the same time, because their terms are arrived at through

---

[14]In *General Acc. Ins. Co.* v. *State Dept. of Environ.* (1996) 143 N.J. 462, 473-479 [672 A.2d 1154, 1160-1163], in which it applied New Jersey law, but spoke generally, the New Jersey Supreme Court implied to the contrary. It evidently did so because it did not follow a contractual/quasi-contractual analysis such as that set out in the text, but rather strayed— erroneously, in our view—in the direction of vague "fairness" and rough "justice." (See also pp. 73-76, *post.*)

mutual agreement of the parties, consent decrees also closely resemble contracts." (*Firefighters* v. *Cleveland* (1986) 478 U.S. 501, 519 [106 S.Ct. 3063, 3073, 92 L.Ed.2d 405].) Their "most fundamental characteristic," however, is their "voluntary nature." (*Id.* at pp. 521-522 [106 S.Ct. at p. 3075].) "Indeed, it is the parties' agreement that serves as the source of the court's authority to enter any judgment at all." (*Id.* at p. 522 [106 S.Ct. at p. 3075].) "More importantly, it is the agreement of the parties, rather than the force of the law upon which the complaint was originally based, that creates the obligations embodied in a consent decree." (*Ibid.*)[15]

 Contrariwise, the insurers assume that site investigation expenses cannot be defense costs to the extent that the underlying site investigation is "agreed" or "committed" to by the insured. Their premise is, apparently, that the effort undertaken by a party in defending itself must be *in*voluntary. It is unsound. As stated, what matters is what is done, not why.

Next, the insurers assert that, if site investigation expenses may constitute defenses costs, so may settlement costs—a result they say is untenable. Again, not so. Site investigation expenses may be defense costs because they may be reasonable and necessary to avoid or at least minimize liability. Settlement costs cannot be defense costs because, instead, they resolve liability.

Finally, the insurers imply that the standard for determining whether the insured's site investigation expenses constitute defense costs is not a "bright line" rule and hence will encourage needless litigation. To our mind, the test is clear. It is certainly as clear as the law allows. All must proceed as best they can.

By giving an affirmative answer to the question whether site investigation expenses may constitute defense costs that the insurer must incur in fulfilling its duty to defend, the Court of Appeal did not err. Surely, it was right to hold prejudicially erroneous the superior court's instruction to the jury to the effect that Aerojet's site investigation expenses did not constitute defense

---

[15]Insofar as the insurers' assumption that site investigation expenses cannot be defense costs to the extent that the underlying site investigation is ordered or requested by the federal or state government is based on the premise that such expenses are indemnification costs within the meaning of *AIU Ins. Co.* v. *Superior Court, supra,* 51 Cal.3d at page 824, i.e., "sums which [the insured] becomes 'legally obligated' to pay as 'damages' . . . because of '[bodily injury or] property damage[,]' " it is unsound. There is a suggestion that a "legal obligation" arises from a governmental order and perhaps even from a governmental request. But any such "legal obligation" need not be "to pay . . . 'damages' . . . because of '[*bodily injury or*] *property damage*.' " For example, as indicated in the text, a legal "obligation" may be imposed under CERCLA even before specified harm is proved—and even if such harm is subsequently disproved.

costs to the extent that they were linked to orders or requests by the United States or the State of California. In its absence, there was a "reasonable chance" (*College Hospital, Inc.* v. *Superior Court* (1994) 8 Cal.4th 704, 715 [34 Cal.Rptr.2d 898, 882 P.2d 894], italics omitted) that the jury would have found at least some of the site investigation expenses—which amounted to $26,655,787.01—to be such. The insurers' claim to the contrary notwithstanding, evidence in support had been presented.

In answering the question of site investigation expenses as it did, the Court of Appeal erred to the extent that it chose to adopt the approach of the federal district court in *Ex-Cell-O I* (*Fireman's Fund Ins. Companies* v. *Ex-Cell-O Corp., supra*, 790 F.Supp. at p. 1338) and *Ex-Cell-O II* (*Fireman's Fund Ins. Companies* v. *Ex-Cell-O Corp., supra*, 790 F.Supp. at p. 1346)—which is, in substance, that an insured's site investigation expenses in connection with a Remedial Investigation/Feasibility Study or RI/FS responding to an order or request by the United States for specific information under .CERCLA are presumed, albeit only rebuttably, not to be defense costs. The federal district court did not present any reasoning, or cite any authority, in support. None is apparent. We shall not follow.[16]

## C

 The second issue on review concerns whether, under standard comprehensive or commercial general liability insurance policies, defense costs may be allocated to the insured.

 The insurer has a duty arising out of the policy as a contract to defend as to a claim, or a part of a claim, that is at least potentially covered because it may possibly embrace some triggering harm of the specified sort within the policy period caused by an included occurrence. It has been held

---

[16]In *General Acc. Ins. Co.* v. *State Dept. of Environ., supra*, 143 N.J. at page 477 [672 A.2d at page 1162], and *Domtar, Inc.* v. *Niagara Fire Ins. Co.* (Minn.Ct.App. 1996) 552 N.W.2d 738, 751-752, affirmed in pertinent part, *Domtar; Inc.* v. *Niagara Fire Ins. Co., supra*, 563 N.W.2d 724, the New Jersey Supreme Court and the Minnesota Court of Appeals, respectively, also adopted the approach of the federal district court in *Ex-Cell-O I* and *Ex-Cell-O II*. Although each cited the federal district court, neither presented any reasoning.

In *Endicott Johnson Corp.* v. *Liberty Mut. Ins. Co.* (N.D.N.Y. 1996) 928 F.Supp. 176, 184, appeal and cross-appeal dismissed (2d Cir. 1997) 116 F.3d 53, the United States District Court of the Northern District of New York held that it would "allocate" Remedial Investigation/Feasibility Study or RI/FS costs as follows: "To the extent that an expense is primarily attributable to remedial investigations . . . the expense will be treated as a defense cost. To the extent an expense is primarily attributable to feasibility studies . . . the expenses will be treated as damages to be indemnified. Finally, to the extent the Court cannot determine . . . whether an expense is attributable to either RI or FS, the Court will have broad discretion to allocate the expense in an equitable manner." (Fn. omitted.) The court thought its method was "simple." (*Ibid.*) In light of the analysis presented in the text, we think it is simplistic.

that, under principles of the law of contract, the insurer may not obtain reimbursement from the insured for defense costs that can be allocated to a claim that is at least potentially covered: "With regard to defense costs" of this sort, "the insurer has been paid premiums by the insured. It bargained to bear these costs. To attempt to shift them would upset the arrangement." (*Buss* v. *Superior Court*, *supra*, 16 Cal.4th at pp. 49-50.) Implicit in this holding is the proposition that the insurer may not obtain reimbursement from the insured for defense costs that can be allocated to a part of a claim that is at least potentially covered. It follows that, pursuant to contract, defense costs that can be allocated to a claim, or a part of a claim, that is at least potentially covered cannot be allocated to the insured.

By contrast, the insurer does not have a duty arising out of the policy as a contract—but may have one imposed by law in support thereof—to defend as to a claim, or a part of a claim, that is not even potentially covered because it does not even possibly embrace any triggering harm of the specified sort within the policy period caused by an included occurrence. It has been held that, under principles of the law of restitution, the insurer may obtain reimbursement from the insured for defense costs that can be allocated solely to a claim that is not even potentially covered: "With regard to defense costs" of this sort, "the insurer has not been paid premiums by the insured. It did not bargain to bear these costs. To attempt to shift them would not upset the arrangement. [Citation.] The insurer therefore has a right of reimbursement that is implied in law as quasi-contractual . . . ." (*Buss* v. *Superior Court*, *supra*, 16 Cal.4th at pp. 50-51.) Implicit in this holding is the proposition that the insurer may obtain reimbursement from the insured for defense costs that can be allocated solely to a part of a claim that is not even potentially covered. It follows that, pursuant to quasi-contract, defense costs that can be allocated solely to a claim, or a part of a claim, that is not even potentially covered can be allocated to the insured.

On the allocation of defenses costs to the insured, it is the insurer that must carry the burden of proof, and it must do so by the preponderance of the evidence. What we said above we say here: "Evidence Code section 500 provides that, generally, a party desiring relief must carry the burden of proof thereon," and "Evidence Code section 115 . . . provides that the burden of proof that is generally applicable is proof by a preponderance of the evidence." (*Buss* v. *Superior Court*, *supra*, 16 Cal.4th at p. 53.) We discern no reason to make an exception here.

In the case at bar, the record on appeal discloses this: From 1956 to about 1975, Aerojet had largely typical comprehensive general liability insurance policies and similar instruments, covering specified harm including bodily injury and/or property damage, that were issued by various

insurers. From 1976 to 1984, it had "fronting" policies of this sort that were issued by INA. With the exception of INA, as to which Aerojet agreed to pay its own defense costs and indeed to defend itself,[17] the insurers each had a duty to defend all the governmental and private actions in their entirety—to be precise, *each* had such a duty *separate and independent from the others* (*Continental Cas. Co.* v. *Zurich Ins. Co.* (1961) 57 Cal.2d 27, 37 [17 Cal.Rptr. 12, 366 P.2d 455]). In each action, each insurer was presented with what was in substance a single broad "mixed" claim. That claim was predicated on facts, alleged or otherwise disclosed, to the effect that, throughout the course of its operations from the early 1950's into the 1980's, Aerojet discharged hazardous substances in an ongoing fashion at its Sacramento site and thereby caused pollution in and around that location resulting in continuous and/or progressively deteriorating bodily injury and/or property damage. That claim, therefore, was at least potentially covered in part under each of the policies pertinent here because it might possibly involve specified harm caused by an included occurrence,[18] with triggering harm of that sort within the policy period in question. Each insurer was "on the risk" for at least one such period. None was on the risk for all. Each, as stated, was presented with a "mixed" claim: At least one of the parts was at least potentially covered because it might possibly embrace some triggering harm of the specified sort within the policy period caused by an included occurrence, and at least one of the parts was not even potentially covered because it did not even possibly embrace any triggering harm of the specified sort within the policy period caused by an included occurrence. Nevertheless, each had a duty, prophylactic although not contractual, to defend all the parts.[19] It is true that INA had no duty to defend whatsoever. But that fact is immaterial so far as the other insurers are concerned. The "fronting" policies created rights and duties between Aerojet and INA. They did not even purport to create any right or duty in either Aerojet or INA as against the world, including the other insurers. Nor could they. As contracts, they were effective only between Aerojet and INA. (*Chandler* v. *Roach* (1957) 156 Cal.App.2d 435, 444 [319 P.2d 776].)

---

[17]In stating that Aerojet agreed to pay its own defense costs and indeed to defend itself, we merely follow the language of the "fronting" policies. Of course, Aerojet did not "contract" with itself to impose an "obligation" on itself.

[18]Or, similarly, by "accident," etc. (See fn. 9, *ante*.)

[19]Each may also have had a corresponding right of some sort to require the others to share in discharging the duty or at least to contribute to its costs. (See generally, Croskey et al., Cal. Practice Guide: Insurance Litigation 2, *supra*, ¶¶ 8:73.10 to 8:73.19, pp. 8-17 to 8-22 [surveying the topic]; see also *Haskel, Inc.* v. *Superior Court* (1995) 33 Cal.App.4th 963, 976, fn. 9 [39 Cal.Rptr.2d 520] [appearing to assume such a right]; cf. *Montrose Chemical Corp.* v. *Admiral Ins. Co., supra*, 10 Cal.4th at p. 687 [stating that, "leaving aside the availability of excess (multiple) policies or 'other insurance' clauses, and absent express policy language decreeing the manner of apportionment of contribution among successive liability insurers, the courts will generally apply equitable considerations to spread the cost [of indemnification] among the several policies and insurers"].)

It follows that, if it carries the burden of proof by a preponderance of the evidence, each insurer may allocate defense costs to Aerojet for any part of the single broad "mixed" claim presented in the governmental and private actions that was not even potentially covered because it did not even possibly embrace any triggering harm of the specified sort within its policy period or periods caused by an included occurrence. For example, on the requisite proof, it may allocate defense costs for a part involving acts or omissions that may possibly have caused bodily injury or property damage— whether continuous or progressively deteriorating, on the one side, or discrete, on the other side—only after its policy or policies expired. (Cf. *Maples* v. *Aetna Cas. & Surety Co.* (1978) 83 Cal.App.3d 641, 644-650 [148 Cal.Rptr. 80] [holding that there is no coverage under a comprehensive general liability policy as to acts or omissions that caused specified harm of any kind only after the policy expired].) On same proof, it may also allocate defense costs for a part involving acts or omissions that may possibly have caused bodily injury or property damage—specifically, discrete bodily injury or property damage—only before its policy or policies incepted. (Cf. *Montrose Chemical Corp.* v. *Admiral Ins. Co.*, *supra*, 10 Cal.4th at p. 691 [implying that there is no coverage under a comprehensive general liability policy as to acts or omissions that caused specified, discrete harm only before the policy incepted].)

Aerojet argues against the foregoing conclusion. It fails to persuade. It does not take any account of the fact that the insurer's duty to defend the entire "mixed" claim is prophylactic and not contractual.

The insurers also argue against the foregoing conclusion. They too fail to persuade.

Generally, the insurers assume that their contractual duty to defend is limited to only that part of a "mixed" claim that comes within a policy period because specified harm may possibly have been caused by an included occurrence therein. They are wrong. As explained above, the duty to defend embraces all the parts of such a claim in which some such harm may possibly have resulted, whether within the policy period or beyond.

More specifically, the insurers imply that they may allocate defense costs to Aerojet more broadly, apparently based on the "fronting" policies issued by INA to Aerojet, or at least on the fact that Aerojet chose to avail itself of such policies. They are wrong here as well. Whatever duty to defend each may have had was provided for in its own policy or policies, and was not affected by Aerojet's subsequent agreement to pay its own defense costs, and indeed defend itself, under INA's. At bottom, their reasoning seems as

follows: If Aerojet had been issued policies by INA that were not of the "fronting" kind, they could have sought "equitable contribution" from INA as to the defense costs (*Truck Ins. Exchange* v. *Amoco Corp.* (1995) 35 Cal.App.4th 814, 827 [41 Cal.Rptr.2d 551]; see generally, *Continental Cas. Co.* v. *Zurich Ins. Co.*, *supra*, 57 Cal.2d at pp. 35-38); because it did not, it should be required to contribute itself. Such an inference fails. At the outset, Aerojet was in fact issued "fronting" policies by INA. Had the situation been different, it might have led to different consequences. But it was not. Be that as it may, let us assume that, if Aerojet had been issued policies by INA that were not of the "fronting" kind, INA might have been required to make an equitable contribution to the defense costs. (See, e.g., *CNA Casualty of California* v. *Seaboard Surety Co.* (1986) 176 Cal.App.3d 598, 620 [222 Cal.Rptr. 276].) That assumption, however, does not compel the conclusion that, because it was issued "fronting" policies by INA, Aerojet should be required to make such a contribution itself. Although insurers may be required to make an equitable contribution to defense costs *among themselves*, that is all: An insured is not required to make such a contribution *together with insurers*. (*Truck Ins. Exchange* v. *Amoco Corp.*, *supra*, 35 Cal.App.4th at pp. 827-828; *County of San Bernardino* v. *Pacific Indemnity Co.* (1997) 56 Cal.App.4th 666, 690-691 [65 Cal.Rptr.2d 657] [following *Truck Ins. Exchange*].) Equitable contribution applies *only* between insurers (*Truck Ins. Exchange* v. *Amoco Corp.*, *supra*, 35 Cal.App.4th. at p. 828; *County of San Bernardino* v. *Pacific Indemnity Co.*, *supra*, 56 Cal.App.4th at pp. 690-691 [following *Truck Ins. Exchange*]), and *only* in the absence of contract (see *Montrose Chemical Corp.* v. *Admiral Ins. Co.*, *supra*, 10 Cal.4th at p. 687). It therefore has no place between insurer and insured, which have contracted the one with the other. ██ ██ Neither does it have any place between an insurer and an uninsured or "self-insured"[20] party. (*Truck Ins. Exchange* v. *Amoco Corp.*, *supra*, 35 Cal.App.4th at pp. 827-828; *County of San Bernardino* v. *Pacific Indemnity Co.*, *supra*, 56 Cal.App.4th at pp. 690-691 [following *Truck Ins. Exchange*].)[21]

 It bears repeating: If specified harm may possibly have been caused by an included occurrence and may possibly have resulted, at least in

---

[20]In a strict sense, "self-insurance" is a "misnomer." (*Nabisco, Inc.* v. *Transport Indemnity Co.* (1983) 143 Cal.App.3d 831, 836 [192 Cal.Rptr. 207]; accord, *Orange County Water Dist.* v. *Association of Cal. Water etc. Authority* (1997) 54 Cal.App.4th 772, 777 [63 Cal.Rptr.2d 182].) "Insurance is a contract whereby one undertakes to indemnify another against loss, damage, or liability arising from a contingent or unknown event." (Ins. Code, § 22.) "[S]elf-insurance . . . is equivalent to no insurance . . . ." (*Richardson* v. *GAB Business Services, Inc.* (1984) 161 Cal.App.3d 519, 523 [207 Cal.Rptr. 519].) As such, it is "repugnant to the [very] concept of insurance . . . ." (*Ibid.*) If insurance requires an undertaking by one to indemnify *another*, it cannot be satisfied by a self-contradictory undertaking by one to indemnify *oneself*.

[21]We find nothing contrary in *City of Oxnard* v. *Twin City Fire Ins. Co.* (1995) 37 Cal.App.4th 1072 [44 Cal.Rptr.2d 177], or *Nabisco, Inc.* v. *Transport Indemnity Co.*, *supra*, 143 Cal.App.3d 831. Each decision holds only that an "excess insurer" does not have a duty ·

part, within the policy period, the duty to defend perdures to all points of time at which some such harm may possibly have resulted thereafter.

By giving an affirmative answer to the question whether defense costs may be allocated to the insured, the Court of Appeal did not err.

In answering the question of allocation of defense costs as it did, the Court of Appeal erred to the extent that it strayed away from the contractual/quasi-contractual analysis set out above in the direction of vague "fairness" and rough "justice."[22]

The Court of Appeal expressed the view that the "logical conclusion" of such contractual/quasi-contractual analysis "would permit [Aerojet] to have been fully insured, for example, with Transport Indemnity . . . for only 1 year out of the 30 years at issue here, then to have carried the subject INA policies for the remaining 29 years but claim a defense from Transport Indemnity for the entire 30-year period."

The Court of Appeal stated that, under its illustration, Aerojet would not have a right to a defense by Transport Indemnity against an entire claim of bodily injury or property damage spanning all 30 years. It implied that 29/30 of the defense costs would have to be allocated to Aerojet, in the apparent belief that " '. . . the insured must bear its share of those costs determined by the fraction of the time of injurious exposure in which it lacked coverage[.]' " (Quoting *Gulf Chemical & Metallurgical* v. *Associated Metals*, *supra*, 1 F.3d at p. 372.)

---

to defend an insured until "primary insurance" in the form of a so-called "self-insured retention" is exhausted. (*City of Oxnard* v. *Twin City Fire Ins. Co.*, *supra*, 37 Cal.App.4th at pp. 1076-1078; *Nabisco, Inc.* v. *Transport Indemnity Co.*, *supra*, 143 Cal.App.3d at pp. 834-837.) The insurers here are not "excess insurers." By their own admission, they are "primary insurers."

[22]Following decisions such as *Ins. Co. North America* v. *Forty-Eight Insulations* (6th Cir. 1980) 633 F.2d 1212, 1224-1225, rehearing granted in part and denied in part *sub nomine Ins. Co. of N.A.* v. *Forty-Eight Insulations* (6th Cir. 1981) 657 F.2d 814, and its progeny including *Sharon Steel* v. *Aetna Cas. and Sur.* (Utah 1997) 931 P.2d 127, 140-142, *Owens-Illinois, Inc.* v. *United Ins. Co.* (1994) 138 N.J. 437, 479 [650 A.2d 974, 995-996], and *Gulf Chemical & Metallurgical* v. *Associated Metals* (5th Cir. 1993) 1 F.3d 365, 372. It is perhaps in *Owens-Illinois* that the concern with "fairness" and "justice" instead of contract and quasi-contract is most evident. There, the New Jersey Supreme Court stated: "When periods of no insurance" along with periods of insurance "reflect a decision by an actor to assume or retain a risk, as opposed to periods when coverage for a risk is not available, to expect the risk-bearer to share in the allocation is reasonable." (*Owens-Illinois, Inc.* v. *United Ins. Co.*, *supra*, 138 N.J. at p. 479 [650 A.2d at p. 995].) Only if one's expectation ignores contract in favor of "fairness" and "justice." For if an actor shifts a risk in some periods and not in others, so far as contract is concerned its omission should generally have the same effect whether it finds its genesis in choice or in compulsion.

But, as explained, even in the Court of Appeal's illustration, Aerojet might indeed have a right to a defense by Transport Indemnity against the entire claim. Its right would be contractual if all the years of the claim were at least potentially covered because year one might possibly have embraced some triggering harm of the specified sort caused by an included occurrence, and year two through year thirty might possibly have embraced some such harm resulting therefrom. By contrast, its right would be prophylactic if some of the years of the claim were at least potentially covered and the others were not, on the ground that the first year might possibly have embraced some triggering harm of the specified sort caused by an included occurrence, but* some of the succeeding 29 years might possibly have embraced some such harm resulting therefrom and the others did not even possibly do so.

As also explained, even though in the Court of Appeal's illustration Transport Indemnity might indeed be able to allocate defense costs to Aerojet, it would be able to do so only as to the part of the claim that was not even potentially covered. It would not be able to do so in accordance with any mechanical pro rata formula based on the time of noninsurance within the time as a whole. Especially so, because, contrary to the assumption, the duty to defend is not limited to the policy period.[23] If specified harm may possibly have been caused by an included occurrence and may possibly have resulted, at least in part, within the policy period, it perdures to all points of time at which some such harm may possibly have resulted thereafter.[24]

Lastly, even though in the Court of Appeal's illustration Aerojet may be said to have "assumed the risk of defending against claims" during year two through year thirty—strictly speaking, it simply did not shift the risk to another[25]—and hence "should now carry . . . the burden," it did not thereby affect Transport Indemnity's duty to defend. It "assumed the risk," and

---

[23]To the extent that they state or imply otherwise, such decisions as *Ins. Co. North America* v. *Forty-Eight Insulations, supra,* 633 F.2d at pages 1224 to 1225, and its progeny including *Sharon Steel* v. *Aetna Cas. and Sur., supra,* 931 P.2d at pages 140 to 142, *Owens-Illinois, Inc.* v. *United Ins. Co., supra,* 138 N.J. at page 479 [650 A.2d at page 995], and *Gulf Chemical & Metallurgical* v. *Associated Metals, supra,* 1 F.3d at page 372, are unsound under the analysis presented in the text.

[24]The result might be different if the standard comprehensive or commercial general liability insurance policy were a kind of "claims made" policy. (See *Montrose Chemical Corp.* v. *Admiral Ins. Co., supra,* 10 Cal.4th at pp. 688-689.) Under a policy of this sort, "the insurer generally is responsible for loss resulting from claims made during the policy period"—and *only* for loss resulting from claims made during the policy period—"no matter when the liability-generating event took place." (*Helfand* v. *National Union Fire Ins. Co.* (1992) 10 Cal.App.4th 869, 885, fn. 8 [13 Cal.Rptr.2d 295].) The standard policy, however, is not such. (See *Montrose Chemical Corp.* v. *Admiral Ins. Co., supra,* 10 Cal.4th at pp. 688-689.) Neither is any of Aerojet's policies pertinent here.

[25]Aerojet was effectively uninsured, not "self-insured." (See fn. 20, *ante.*)

"should now carry . . . the burden," of defending *only* against claims based on any harm that may possibly have been caused *only after* Transport Indemnity's policy expired at the end of year one. Such a risk is surely not negligible, extending as it does from year two through year thirty. But it is Transport Indemnity that "assumed the risk," and "should now carry . . . the burden," of defending against any claim that is based on specified harm that may possibly have been caused by an included occurrence and may possibly have resulted, albeit only in part, within the policy period in year one. Its duty to defend was triggered when specified harm was possibly caused by an included occurrence, because at least some such harm may possibly have resulted within the policy period in the first year. It extended to all specified harm that was possibly caused by an included occurrence, even if some such harm may possibly have resulted beyond the policy period in the succeeding 29 years. In a word, although the *trigger* of the duty to defend is limited to the policy period, the *extent* of the duty to defend is not. (Cf. *Montrose Chemical Corp.* v. *Admiral Ins. Co., supra*, 10 Cal.4th at p. 686 [holding that, although the *trigger* of the duty to indemnify is limited to the policy period, the *extent* of the duty to indemnify is not]; *Armstrong World Industries, Inc.* v. *Aetna Casualty & Surety Co., supra*, 45 Cal.App.4th at p. 105 [same].)

Beneath the Court of Appeal's concern about "fairness" and "justice" is, apparently, a belief that, without an approach like the one it adopted, Aerojet might get a windfall from the insurers. That is not the case. We shall assume for argument's sake that Aerojet has enjoyed great good luck over against the insurers. But the pertinent policies provide what they provide. Aerojet and the insurers were generally free to contract as they pleased. (*Linnastruth* v. *Mut. Benefit etc. Assn.* (1943) 22 Cal.2d 216, 218 [137 P.2d 833].) They evidently did so. They thereby established what was "fair" and "just" inter se. We may not rewrite what they themselves wrote. (*Phelps* v. *Allstate Ins. Co.* (1980) 106 Cal.App.3d 752, 758 [165 Cal.Rptr. 263].) We must certainly resist the temptation to do so here simply in order to adjust for chance—for the benefits it has bestowed on one party without merit and for the burdens it has laid on others without desert. (See *Third Story Music, Inc.* v. *Waits* (1995) 41 Cal.App.4th 798, 809 [48 Cal.Rptr.2d 747]; *Walnut Creek Pipe Distributors, Inc.* v. *Gates Rubber Co.* (1964) 228 Cal.App.2d 810, 815 [39 Cal.Rptr. 767].)[26] As a general matter at least, we do not add to, take away from, or otherwise modify a contract for "public policy considerations."

---

[26]We are consequently in accord with decisions that have resisted temptation in this regard, such as *Armstrong World Industries, Inc.* v. *Aetna Casualty & Surety Co., supra*, 45 Cal.App.4th at pages 55 to 57, and *Keene Corp.* v. *Ins. Co. of North America* (D.C. Cir. 1981) 667 F.2d 1034, 1050 [215 App.D.C. 156], and are contra to those that have not, such as *Ins. Co. North America* v. *Forty-Eight Insulations, supra*, 633 F.2d at pages 1224 to 1225, and its progeny including *Sharon Steel* v. *Aetna Cas. and Sur., supra*, 931 P.2d at pages 140 to 142, *Owens-Illinois, Inc.* v. *United Ins. Co., supra*, 138 N.J. at page 479 [650 A.2d at page 995],

(*AIU Ins. Co.* v. *Superior Court, supra,* 51 Cal.3d at p. 818.)[27] We would certainly not do so here, where such considerations depend in large part on the amassing and analyzing of complex and extensive empirical data, which belong more appropriately to the executive and legislative branches than to the judicial.[28] We shall therefore allow whatever "gains" and "losses" there may be to lie where they have fallen.[29]

---

and *Gulf Chemical & Metallurgical* v. *Associated Metals, supra,* 1 F.3d at page 372. At least to some extent, the latter seem predicated on the assumption that equitable contribution is applicable between an insurer and an uninsured or "self-insured" party. As explained in the text, that assumption is unsound.

[27]We therefore cannot, and will not, follow courts that do, such as the New Jersey Supreme Court in *Owens-Illinois, Inc.* v. *United Ins. Co., supra,* 138 N.J. at pages 474 to 480 [650 A.2d at pages 993-996].

[28]In *Owens-Illinois, Inc.* v. *United Ins. Co., supra,* 138 N.J. at pages 474 to 480 [650 A.2d at pages 993-996], a case involving asbestos, the New Jersey Supreme Court all but conceded as much. It declined to amass and analyze the pertinent empirical data itself in favor of directing the trial court, at page 477 [650 A.2d at page 994], to "appoint a master, one skilled in the economics of insurance, to" attempt to do so.

[29]We observe that Aerojet may indeed have gotten from the insurers more in defense costs than it could have gotten in indemnification costs. But it got no more than it had a right to: Although indemnification costs were limited by the pertinent policies, defense costs were not. The insurers might perhaps have avoided such a pass, as through the issuance of "self-consuming" or "burning limits" policies, under which the indemnification limit is reduced dollar for dollar by defense costs until zero is reached and the duty to indemnify and the duty to defend are then terminated (see Croskey et al., Cal. Practice Guide: Insurance Litigation 2, *supra,* ¶ 7:656, p. 7B-34). They apparently did not attempt to do so.

The insurers may be understood to argue that, if the same costs *may be* characterized as both indemnification costs and defense costs, they *should be* characterized as the former rather than the latter.

At least as a general matter, as we have explained, indemnification costs and defense costs are mutually exclusive: The latter are expenses to avoid or at least minimize liability that arise before the insured's liability is established and apart therefrom; the former are expenses to resolve liability that arise after the insured's liability is established and as a result thereof. Hence, at least as a general matter, the same costs cannot be characterized as both. In any event, they should not be characterized as the former rather than the latter, as it were, by default. No basis exists therefor in the pertinent policies. None shall be created here. (See *Domtar, Inc.* v. *Niagara Fire Ins. Co., supra,* 563 N.W.2d at pp. 738-739 [applying Minnesota law, but speaking generally, to the effect that, even if the same costs could be characterized as both indemnification costs and defense costs, they should not be characterized as the former rather than the latter: that the same costs may do double duty as both indemnification costs and defense costs means that they do, in fact, do duty as the latter as well as the former].)

In her concurring and dissenting opinion, in which she invokes the public policy underlying Insurance Code section 533 not to encourage "wilful acts" on the part of the insured by prohibiting indemnification by the insurer for any liability based thereon (e.g., *Horace Mann Ins. Co.* v. *Barbara B.* (1993) 4 Cal.4th 1076, 1087 [17 Cal.Rptr.2d 210, 846 P.2d 792]; *Gray* v. *Zurich Insurance Co., supra,* 65 Cal.2d at pp. 277-278), Justice Kennard creates a novel, and concededly "complicated" (conc. and dis. opn. of Kennard, J., *post,* at p. 87), scheme to govern when, if ever, the same costs could be characterized as both indemnification costs and defense costs. The premise is that, by incurring defense costs that obviate indemnification

## III

For the reasons stated above, we conclude that we must affirm in part and reverse in part the judgment of the Court of Appeal. Specifically, we must: (1) affirm the judgment to the extent that it holds that site investigation expenses may constitute defense costs that the insurer must incur in fulfilling its duty to defend under standard comprehensive or commercial general liability insurance policies; (2) affirm the judgment to the extent that it holds that defense costs may be allocated to the insured under such policies; (3) reverse the judgment to the extent that it holds that such costs should be allocated pro rata based on the time of noninsurance within the time as a whole; (4) otherwise affirm the judgment; and (5) direct the Court of Appeal to remand the cause to the superior court for proceedings not inconsistent with the views expressed in this opinion.

It is so ordered.

George, C. J., Werdegar, J., and Brown, J., concurred.

**KENNARD, J.,** Concurring and Dissenting.—In this case, the majority addresses three issues concerning the rights and duties of insurer and insured under a standard commercial general liability (CGL) insurance policy when the insured has been sued for progressive property damage or personal injury caused by toxic pollution. In my view, the majority decides only one of these issues correctly.

The first issue that the majority addresses is whether site investigation costs—that is, costs incurred to determine the origin, nature, and extent of toxic pollution and the most appropriate remedial measures—are defense costs that the insurer must incur in fulfilling its duty to defend. Starting from the premise that defense costs and indemnity costs are mutually exclusive, the majority concludes that site investigation costs are defense costs rather than indemnity costs when the site investigation is conducted "within the temporal limits of the insurer's duty to defend" and "amount[s] to a reasonable and necessary effort to avoid or at least minimize liability," provided that the claimed expenses are "reasonable and necessary for that purpose." (Maj. opn., *ante*, at pp. 60-61.)

---

costs, the insurer incurs indemnification costs. It is unsound. It would threaten to transform all defense costs into indemnification costs. That is certainly true of all defense costs that prove to be well spent, that is to say, all that in fact avoid or at least minimize liability. For defense costs of this sort necessarily obviate indemnification costs.

Instead of starting from the premise that defense costs and indemnity costs are mutually exclusive, I would begin by acknowledging that site investigation may serve both to avoid or minimize liability and to discharge a cleanup obligation, and therefore a particular site investigation cost may be both a defense cost and an indemnity cost. Next, I would separately consider the situations of insureds who did not pollute, insureds who polluted but did not expect or intend the resulting harm, and insureds who polluted and did expect or intend the resulting harm.

In the first situation, in which it is ultimately determined, by judgment or settlement, through site investigation or otherwise, that the insured has no liability for toxic pollution, the absence of liability means that there are no indemnity costs. In this situation, all site investigation costs reasonably incurred as part of the ultimately successful effort to avoid liability should be treated as defense costs that the insurer must pay under its duty to defend. In the second situation, in which it is ultimately determined that the insured is a toxic polluter but one who did not expect or intend the resulting harm, the duty to defend requires the insurer to pay site investigation costs reasonably incurred to avoid or minimize liability, but if those same costs also serve to discharge the insured's cleanup liability, then they also constitute indemnity costs that the insurer may credit against the liability limits of the policy. In the third situation, in which it is ultimately determined that the insured is a toxic polluter who expected or intended the resulting harm, the public policy against indemnity for willful wrongs must be considered in deciding whether the insurer is obligated to pay site investigation costs. To the extent that site investigation serves to discharge the insured's cleanup liability, this public policy requires that the insured rather than the insurer bear those cleanup costs.

The second issue that the majority addresses is whether, when the insurer has incurred costs in the defense of what the majority terms a "mixed claim," meaning a claim having parts that are potentially covered and parts that are not potentially covered, the insurer may obtain reimbursement from the insured for defense costs that may be allocated solely to parts of the claim that are not potentially covered. The majority decides that an insurer may obtain reimbursement from the insured for such costs, treating this issue as controlled by this court's recent decision in *Buss* v. *Superior Court* (1997) 16 Cal.4th 35 [65 Cal.Rptr.2d 366, 939 P.2d 766]. I dissented in *Buss* (*id.* at p. 62) and would not further extend the scope of that misguided decision, which ignored clear policy language and standard principles of contract law.

The third issue concerns equitable allocation of defense costs among insurers having defense obligations that overlap because each insurer afforded coverage during part of the time when a progressive property damage

or personal injury was occurring. Specifically, the issue is whether, in the process of equitably allocating defense costs among insurers having overlapping defense obligations, an insured who lacked coverage during part of the period in question may be treated as its own insurer and on this basis equitably allocated a portion of the defense costs. The majority concludes that in this situation those insurers having a duty to defend are required to bear all defense costs and that no portion of the defense costs may be allocated to the insured. I agree and concur in this portion of the majority opinion.

I

Since 1951, Aerojet-General Corporation (Aerojet) has operated a large facility near Sacramento to develop and produce missile and rocket motors under government contracts. Between 1956 to 1984, the time period relevant here, Aerojet purchased liability coverage under a series of CGL policies issued by various insurers. Between 1976 and 1984, Aerojet purchased "cash flow" or "fronting" policies from Insurance Company of North America (INA). These policies contained endorsements that shifted to Aerojet the ultimate cost of both indemnification and defense.

In 1979, it was discovered that the groundwater beneath and around Aerojet's Sacramento facility had been contaminated with trichloroethylene (TCE), a chemical solvent that Aerojet had used in large quantities. Discovery of the TCE pollution led the federal and state governments and various private parties to sue Aerojet, which sought indemnification and defense from its liability insurers. The insurers (except INA) provided a defense but reserved their rights to dispute indemnity coverage.

Several insurers commenced this action by filing a complaint for declaratory relief to clarify their obligations under the CGL policies they had issued to Aerojet. Aerojet cross-complained against all the insurance companies that had issued CGL policies to it between 1956 and 1984. The insurers' complaint eventually was dismissed without prejudice, and the case went to trial on Aerojet's cross-complaint. The action was tried in three phases. In the first phase, the trial court construed the relevant disputed language of the insurance policies. In the second phase, the jury applied the policy language as construed by the trial court to the evidence presented. Specifically, it applied the standard CGL policy language limiting the insurers' obligations to harm that was "neither expected nor intended from the standpoint of the insured," *and the jury concluded that there was no indemnity coverage for the damages occasioned by the TCE pollution because Aerojet had expected or intended the harm caused by that pollution.*

Before the third phase began, the parties entered into a detailed stipulation. They agreed that the insurers had paid or would pay all ordinary defense costs, such as attorney fees and expert witness fees, through the final disposition of any appeal Aerojet would take from the judgment to be entered in the action. They also agreed that in the third phase the parties would litigate only whether site investigation expenses were defense costs, the insurers would not seek reimbursement of any part of the ordinary defense costs, and Aerojet would not seek "bad faith" damages. Finally, they agreed that if the case were to be retried following a reversal on appeal of the judgment that would be entered after the conclusion of the third phase, then upon retrial the insurers would be free to seek reimbursement for defense costs from Aerojet, and Aerojet in turn would be free to seek "bad faith" damages from the insurers.

During the third phase of the trial, the jury determined that costs of government-mandated site investigations were not defense costs, and therefore the insurers were not required to pay these costs to discharge their duty to defend. The trial court entered judgment against Aerojet on its cross-complaint. Aerojet appealed, raising issues relating to each of the three phases of the trial.

The Court of Appeal concluded that although the trial court had committed certain errors in the first and second phases of the trial, Aerojet had not been prejudiced by these errors in light of the overwhelming evidence that Aerojet knew both that TCE was a highly toxic and harmful pollutant and that its disposal practices were causing TCE pollution of the groundwater. *Thus, the Court of Appeal upheld the jury verdict at the second phase that, because Aerojet had expected or intended the harm caused by the TCE pollution, the insurers had no indemnity obligation.*

As for the third phase, the Court of Appeal reached these conclusions: (1) The jury's finding that none of the site investigation expenses were defense costs was prejudicially affected by erroneous instructions; and (2) liability for defense costs should be equitably apportioned among the various insurers, and in this apportionment Aerojet should also bear a reasonable share because it chose to be self-insured for defense costs, by means of the INA "fronting" policies, for part of the time during which the harm was occurring. The Court of Appeal reversed the judgment as to the third phase only and remanded for a limited new trial.

Aerojet petitioned this court for review, raising several issues. Three of the insurance carriers also petitioned for review, raising only the issue

whether a CGL insurer's defense obligation includes payment of site investigation costs. This court granted both petitions but ultimately limited the issues on review to those that the majority addresses. *This court has declined to address any issue concerning the determination that, because Aerojet expected or intended the harm caused by the TCE pollution, the insurers have no indemnity obligation. Accordingly, that determination is no longer subject to appellate review and will become final.*

## II

The standard CGL policy defines the insurer's indemnity obligation as the duty to pay "all sums that the insured becomes legally obligated to pay as damages" as a result of personal injury or property damage or other covered risk, provided that the damages are to compensate for harm that was "neither expected nor intended from the standpoint of the insured." In *AIU Ins. Co.* v. *Superior Court* (1990) 51 Cal.3d 807, 814 [274 Cal.Rptr. 820, 799 P.2d 1253], we held that in this standard language the term "damages" includes cleanup and other "response" costs incurred under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) (42 U.S.C. § 9601 et seq.) and related state and federal environmental laws. Thus, the term "damages" is not limited to money that the insured must pay to an injured third party under a liability judgment, but includes also money that the insured must pay to comply with a legal obligation for cleanup of toxic pollution.

Apart from its duty to indemnify, an insurer under a CGL policy has a duty to defend the insured in any "suit" seeking damages potentially within the policy's indemnity coverage. (See *Buss* v. *Superior Court, supra,* 16 Cal.4th 35, 62-63 (dis. opn. of Kennard, J.).) It is settled, and not disputed here, that an insurer's duty to defend includes a duty to investigate the factual allegations of a third party's claim against the insured whenever the investigation constitutes a reasonable effort to avoid or reduce the insured's liability.

In a standard CGL policy, indemnity coverage is subject to dollar limits specified in the policy, but defense coverage is not subject to any specified dollar limit. Otherwise stated, the policy's monetary limits have no application to defense costs.

Under CERCLA, once a federal agency identifies a suspected polluter (referred to in CERCLA as a "potentially responsible party" or PRP), the agency may require the PRP to conduct a site investigation (which CERCLA

calls a "remedial investigation/feasibility study" or RI/FS) to determine the extent of the pollution and the most feasible method of cleaning it up. If the PRP does not comply with the agency's request to perform an RI/FS, the agency will perform the RI/FS itself and charge the cost to the PRP. Generally, however, it is advantageous for the PRP to perform the RI/FS itself, because the results of the study are critical in determining whether, and if so how much, the PRP will eventually have to pay for the cleanup.

Because the results of the RI/FS can be used to demonstrate that there is no toxic pollution, that a PRP is not the source of the pollution, or that the pollution is less severe or less extensive than claimed, or to demonstrate the feasibility of cleanup methods less costly than those the agency might otherwise have demanded, Aerojet and other insureds claim that the costs of the RI/FS are entirely defense costs that their insurers must pay. If the costs are treated only as defense costs, they do not count against the policy limits. This is critical in a case like this one, in which some $26 million has been spent on site investigation, including the RI/FS.

The majority states that an insurer, to discharge its duty to defend, "must undertake reasonable and necessary efforts to avoid or at least minimize liability" and for this purpose "must incur reasonable and necessary costs." (Maj. opn., *ante*, at p. 60.) From these simple and indisputable propositions, the majority concludes that site investigation expenses are defense costs, and not indemnity costs, whenever the site investigation is "conducted within the temporal limits of the insurer's duty to defend" and amounts "to a reasonable and necessary effort to avoid or at least minimize liability," provided only that the particular expense incurred is "reasonable and necessary for that purpose." (*Id.* at pp. 60-61.)

The majority states that this court's decision in *AIU Ins. Co.* v. *Superior Court, supra,* 51 Cal.3d 807, is "[n]ot to the contrary" and stands only for the proposition that certain site investigation expenses may be indemnity costs, not for the proposition that site investigation costs may never be defense costs. (Maj. opn., *ante*, at p. 61.)

In a footnote, the majority states that defense costs and indemnity costs are mutually exclusive and that the same cost cannot be both an indemnity cost and a defense cost. (Maj. opn., *ante*, at p. 61, fn. 13.) The majority distinguishes the two by stating that indemnity costs "arise after the insured's liability is established and as a result thereof" whereas defense costs "arise before the insured's liability is established and apart therefrom." (*Ibid.*)

Two basic defects permeate the majority's analysis of this issue.

First, the majority is wrong in its assertion that defense costs and indemnity costs are mutually exclusive and may be readily distinguished by determining whether the cost was incurred before or after the insured's liability was established. The majority assumes that in every situation that may arise under a CGL policy, there is a single point in time when the insured's liability is fixed, so that expenses incurred after that point cannot be defense costs (because there is no longer anything to defend) while expenses incurred before that point cannot be indemnity costs (because there was not yet a liability to discharge). But defense and indemnity costs are not so easily separated. In particular, it frequently happens that an insured will admit the fact of liability but dispute the amount or extent of that liability. Here, for example, Aerojet conceded at an early stage that it was the source of the TCE pollution around its Sacramento facility, and it agreed in principle to pay the costs of cleanup; thereafter, the dispute shifted to issues such as the extent of the pollution and the most cost-effective method of cleanup. After conceding the fact of liability, and while disputing the extent of liability, an insured may incur costs that are defense costs as well as indemnity costs because they are incurred for diagnostic or other services that operate both to reduce and to discharge liability. In the context of a CERCLA enforcement action, an RI/FS may serve these dual purposes. In the context of a personal injury claim, the cost of a medical diagnostic procedure may likewise be both a defense cost and an indemnity cost because the procedure may both show that the injury is less serious (and thus the insured's potential liability is less costly) than claimed and also constitute a necessary and integral part of the treatment for the injury. In brief, a single expense may qualify as an indemnity cost because it serves to partially discharge the insured's liability and as a defense cost because it assists, or could assist, in limiting the scope of the insured's liability.

The majority's "temporal limits" approach, under which defense costs and indemnity costs are mutually exclusive and the categorization of a particular cost is determined by reference to whether it was incurred before or after liability was fixed, cannot be applied successfully to the complex situations that arise under CGL policies. Toxic pollution cases are particularly resistant to this approach because the actual monetary cost of the polluter's liability is rarely fixed in advance, but is usually determined retrospectively, after the cleanup is finished. If the tab is totaled only at the end, there is room to argue that costs incurred at every step of the process are defense costs because they may reduce subsequent cleanup costs by demonstrating that there are cheaper cleanup methods than those advocated by the government, that the methods used have been effective, or that the pollution is actually

less severe than thought. There is also room to argue that none of the costs are indemnity costs that the insurer may charge against the policy limits because all were incurred before the full extent of the insured's liability was established.

The second global defect in the majority's approach is that it completely ignores the public policy against indemnity coverage for intentional torts. This policy is embodied in Insurance Code section 533, which provides that an insurer "is not liable for a loss caused by the wilful act of the insured." (See *J. C. Penney Casualty Ins. Co.* v. *M.K.* (1991) 52 Cal.3d 1009, 1019-1021 [278 Cal.Rptr. 64, 804 P.2d 689].) As the majority recognizes, the standard CGL policy language limiting coverage to harm "neither expected nor intended from the standpoint of the insured" implements Insurance Code section 533. As the majority puts it, "If specified harm is 'expected' or 'intended' by the insured, it is effectively caused by a 'wilful act' within the meaning of Insurance Code section 533, and hence outside of coverage." (Maj. opn., *ante*, at p. 49.) Despite its acknowledgment of this important public policy, the majority gives the policy no consideration in deciding whether site investigation costs should be categorized as defense costs, indemnity costs, or both. The majority's disregard for this policy is remarkable given the determination in this very case that Aerojet expected or intended the harm caused by the TCE pollution. By requiring Aerojet's insurers to foot the bill for all site investigation that might have proved useful to the defense effort, without regard to whether the site investigation was also necessary to remedy the harm caused by the intentional toxic pollution, the majority effectively compels at least partial indemnity coverage for an intentional tort.

I propose a different approach. I would begin by asking whether the insured is a nonpolluter, a polluter who neither expected nor intended harm, or a polluter who expected or intended harm. I would treat each of these situations differently.

If it is ultimately determined that the insured did not pollute and thus has no cleanup obligation, there can be no overlap between defense costs and indemnity costs because the insured has no liability that could trigger an insurer's indemnification duty. In this situation, site investigation costs reasonably incurred for a proper defense purpose are defense costs that the insurer must pay, without limitation as to amount, under its duty to defend. As the majority and I agree (maj. opn., *ante*, at pp. 76-77, fn. 29), this conclusion follows from the standard CGL policy language.

If it is ultimately determined that the insured is responsible for toxic pollution, and thus also that the insured has a cleanup obligation, there may

be an overlap between defense costs and indemnity costs because site investigation may serve both to reduce and to discharge the insured's cleanup liability. But the consequences of this overlap cannot be explained without distinguishing between, on the one hand, an insured who expected or intended the harm resulting from the pollution, and, on the other hand, an insured who did not expect or intend that harm.

If the insured neither expected nor intended the harm caused by the pollution, the insurer under a standard CGL policy has both a duty to defend and a duty to indemnify. The defense obligation is not subject to policy limits; the indemnity obligation is. In this situation, if a particular site investigation activity serves both a proper defense purpose and to discharge the insured's cleanup liability, the reasonable cost of that activity is both a defense cost and an indemnity cost. Because it is a defense cost, the insurer must pay the site investigation expense without regard to policy limits (in other words, no amount of such payments can exhaust the duty to defend). Because it is *also and equally* an indemnity cost, however, the insurer may credit the payment against the policy's limit on indemnity coverage, thereby reducing its obligation to pay other indemnity costs. These consequences necessarily follow from the language of the standard CGL policy.

The majority disputes this conclusion, apparently based on its stubborn insistence that site investigation costs may be characterized as either defense costs or indemnity costs, but not both. (Maj. opn., *ante*, at pp. 76-77, fn. 29.) The majority cites no provision of the standard CGL policy precluding dual characterization of costs or precluding the insurer from counting such costs dual-purpose costs against the limits of indemnity coverage. For example, the standard CGL policy might provide, but does not, that indemnity expenses count against the policy limits *except when they also serve a proper defense purpose*. Absent limiting language of this sort, the unambiguous policy must be construed to provide that insurers may count against the policy limits all indemnity expenses regardless of whether they also serve a proper defense purpose.

The remaining situation is the one at issue here, in which the insured expected or intended the harm resulting from the insured's own acts of toxic pollution. Because the insured has a cleanup obligation, there is a potential for overlap of defense and indemnity costs because site investigation may serve both to determine and to discharge the insured's cleanup obligation. But in this situation there is no indemnity coverage, both by virtue of the standard CGL policy exclusion for harm that the insurer expected or intended and by operation of Insurance Code section 533's prohibition against

indemnity for losses caused for willful acts. Thus, the insured may not require the insurer to pay costs necessary to discharge the cleanup liability. Nevertheless, the insurer is obligated to provide the insured with a defense until it is established that the insured expected or intended the harm. (See *Horace Mann Ins. Co.* v. *Barbara B.* (1993) 4 Cal.4th 1076 [17 Cal.Rptr.2d 210, 846 P.2d 792].)

If a particular site investigation activity is useful both to reduce and to discharge the insured's cleanup liability, the reasonable cost of that activity is both a defense cost and indemnity cost. Because it is a defense cost, the insurer is obligated under the standard CGL insurance policy to pay it if it was incurred before the determination was made that the insured expected or intended the harm. But because it is also an indemnity cost, the insurer is prohibited by Insurance Code section 533 from paying it, regardless of when it was incurred. This conflict in the insurer's obligations—under which it must both pay and not pay the same cost—must be resolved. I would resolve it in favor of enforcing Insurance Code section 533 and relieving the insurer from any contractual obligation it might otherwise have to pay these dual-purpose costs as defense costs. This analysis is based on the standard CGL policy language and on Insurance Code section 533. The resolution of the conflict—a conflict that the majority fails even to acknowledge—is designed to best implement Insurance Code section 533.

Of course, site investigation costs are often incurred before it has been established that the insured expected or intended the harm resulting from the toxic pollution. So long as there is a possibility (because it has not been established that the exclusion for willful harm applies) that the insurer has a duty to indemnify for liability resulting from the pollution, the insurer must pay, as incurred, the reasonable costs of site investigation that serves, or could serve, a proper defense purpose. (See *Gray* v. *Zurich Insurance Co.* (1966) 65 Cal.2d 263, 275-279 [54 Cal.Rptr. 104, 419 P.2d 168].) Upon a determination that the insured expected or intended the harm resulting from the pollution, the insured should be required to reimburse the insurer for the cost of all site investigation that served to discharge the insured's cleanup obligation.

The majority asserts that insofar as this reimbursement serves to relieve the insurer of a contractual obligation to pay costs incurred in the defense of its insured against a "wilful act" claim, it is inconsistent with prior decisions of this court. (Maj. opn., *ante*, at pp. 76-77, fn. 29.) But none of the decisions the majority cites considered the problem of dual-purpose costs, and none required an insurer to pay indemnity costs for harm caused by a willful act of the insured merely because the same costs might also be characterized as

defense costs. Indeed, the majority here takes the unprecedented step of establishing a nonstatutory exception to Insurance Code section 533's prohibition against indemnity for harm caused by a willful act of the insured.

Although the views I have stated provide a somewhat complicated answer to what may have seemed a simple question, they not only follow logically from the standard CGL policy language and from Insurance Code section 533, but also accommodate the various public and private interests implicated when an alleged polluter with CGL coverage incurs costs for site investigation.

### III

On the second issue, the majority concludes that a CGL insurer may obtain reimbursement from the insured for defense costs that may be allocated solely to *parts of claims* that are not potentially covered under the policy. (Maj. opn., *ante*, at p. 69.) The majority states that this conclusion is logically compelled by this court's decision in *Buss* v. *Superior Court, supra,* 16 Cal.4th 35. (Maj. opn., *ante*, at p. 69.)

Because the majority offers nothing new on this point, relying instead on its analysis in *Buss* v. *Superior Court, supra,* 16 Cal.4th 35, my dissent to that decision (*id.* at p. 62) explains why the majority's reasoning is unpersuasive here. Briefly, the standard CGL policy uses language obligating the insurer to defend any "suit" that potentially seeks covered damages, and it contains no provision obligating the insured to reimburse the insurer for the cost of defending particular claims within such a suit that are not potentially covered. Applying standard principles of contract interpretation to the policy language, the conclusion is inescapable that when an action includes both claims that are potentially covered and claims that are not potentially covered, or claims that are potentially covered in some parts and not in others, the insurer is contractually obligated to defend the entire suit.

As it did in *Buss* v. *Superior Court, supra,* 16 Cal.4th 35, the majority ignores the policy language obligating the insurer to defend the whole of any "suit" asserting a potentially covered claim, without reserving any right of reimbursement for costs that may be attributable to claims, or parts of claims, that are not potentially covered. Indeed, the majority's holding is even more troubling than its holding in *Buss* because it requires acceptance of the proposition that individual claims may be subdivided into parts, each of which can then be characterized as potentially covered or not potentially covered. This minute dissection is likely to be a litigation nightmare for trial

courts. Although the decision in *Buss* is now the law, there is no reason to extend it further, and every reason to limit it to the greatest possible extent.

## IV

On the third issue, the majority holds that although insurers having overlapping defense obligations may equitably apportion defense costs among themselves, an insured is not required to make a contribution together with the insurers, even when the insured lacked insurance during part of the time that the progressive loss was occurring. (Maj. opn., *ante*, at p. 72.) I concur in the reasoning of the majority on this issue only.

### CONCLUSION

Here, the jury determined that Aerojet's site investigation costs were not defense costs that Aerojet's CGL insurers were required to pay to discharge their duty to defend Aerojet. Because Aerojet has been determined to have expected or intended the harm cause by the TCE pollution, because public policy precludes indemnification for harm that the insured expected or intended, and because site investigation was a necessary step in discharging Aerojet's cleanup obligation, I would not require Aerojet's insurers to pay the site investigation costs but would instead uphold the jury determination on this issue. I dissent from the majority opinion to the extent it reaches a contrary conclusion.

Because an insurer's contractual defense obligation under the standard language of a CGL policy runs to the whole of any action seeking potentially covered damages, not to individual claims or parts of claims, I dissent from the majority's holding that Aerojet must reimburse its insurers for any defense costs that may be allocated solely to parts of claims not potentially covered.

I concur in the majority's holding that in the equitable apportionment of defense costs among insurers having overlapping defense obligations, no share of these costs may be allocated to Aerojet on the theory that it was its own insurer under the INA fronting policies.

I would reverse the judgment of the Court of Appeal and remand the matter to that court with directions to affirm the judgment of the superior court.

**CHIN, J.,** Concurring and Dissenting.—I concur in the majority's analysis in parts I. and II.B. I dissent, in part, to the majority's discussion of general

insurance principles in part II.A., and in total to part II.C., and the majority's discussion and judgment on the allocation of defense costs. As the Court of Appeal correctly observed, the various policies governing the occurrence and "principles of contract law" determine the present allocation question. (See *Montrose Chemical Corp.* v. *Admiral Ins. Co.* (1995) 10 Cal.4th 645, 681, fn. 19 [42 Cal.Rptr.2d 324, 913 P.2d 878] (*Montrose*).) From 1976 to 1984, Aerojet-General Corporation (Aerojet) was insured solely by Insurance Company of North America's (INA) financial responsibility policies, also known as "fronting" or "cash flow" policies (providing limited indemnity and no defense costs for any loss suffered by the insured in exchange for a reduced premium). By adopting this insurance plan, Aerojet made a deliberate decision to assume its own defense costs in exchange for a reduction in premium costs. Indeed, during the eight-year period Aerojet contracted to pay its own defense costs, it was, in essence, acting as its own insurer for that purpose.

The majority, however, chooses to ignore both fundamental contract interpretation rules and our own *Montrose* opinion to conclude that Aerojet's contract with INA was irrelevant, and that Aerojet never assumed the risk that a loss might occur during the period it was insured by INA's limited cash flow policies. But "When periods of no insurance reflect a decision by an actor to assume or retain a risk, as opposed to periods when coverage for a risk is not available, to expect the risk-bearer to share in the allocation is reasonable." (*Owens-Illinois, Inc.* v. *United Ins. Co.* (1994) 138 N.J. 437, 479 [650 A.2d 974, 995].) As the trial court and the Court of Appeal held, Aerojet should contribute its pro rata share of defense costs for the period INA provided it with limited cash flow coverage. Instead, the majority hands Aerojet a windfall by forcing successive insurers, including the named defendant here, to pay defense costs they did not contract to provide.

The majority's faulty reasoning begins with its discussion in part II.A. about the scope of commercial general liability (CGL) insurance coverage. In discussing an insurer's duty to indemnify its insured, the opinion relies on *Montrose, supra,* 10 Cal.4th at pages 669-673, to assert that the duty "extends to all specified harm that may possibly have been caused by an included occurrence, even if some such harm may possibly have resulted beyond the policy period." (Maj. opn., *ante*, at p. 58.) In other words, the majority explains, "if specified harm may possibly have been caused by an included occurrence and may possibly have resulted, at least in part, within the policy period, it perdures to all points of time at which some such harm may possibly have resulted thereafter." (*Ibid.*, fn. omitted.) The majority's

reasoning effectively requires an insurer to indemnify a loss occurring outside the policy period as long as the policy covered the loss at some point in time. This is the opposite of what *Montrose* requires. (*Montrose, supra,* 10 Cal.4th at p. 673.) *Montrose* held that, in defining an "occurrence" within the context of a CGL insurance policy, the drafters intended (1) that the occurrence of damage during the policy period is the operative event that triggers an indemnity obligation, and (2) that the CGL policy afford "liability coverage for all property damage or injury occurring *during the policy period.*" (*Ibid.,* italics added.) Nowhere does *Montrose* require an insurer to *indemnify* or *reimburse* an insured for a monetary loss incurred outside the policy period. To do so would extend coverage beyond the CGL policy scope, hold insurers to joint and several liability, and result in a windfall to the insured.

As the Court of Appeal observed, *Montrose* specifically rejected a joint and several liability approach to allocating losses among insurers. As *Montrose* itself pointed out, "Allocation of the cost of indemnification once several insurers have been found liable to indemnify the insured for all or some portion of a continuing injury or progressively deteriorating property damage requires application of principles of contract law to the express terms and limitations of the various policies of insurance on the risk." (*Montrose, supra,* 10 Cal.4th at p. 681, fn. 19.) I agree with the Court of Appeal that *Montrose*'s rejection of joint and several liability in cases involving multiple insurers and successive policies issued over the time period of the developing loss supports allocating the contractual responsibilities in multiple coverage cases. For these reasons, I cannot embrace the majority's broad introductory reasoning.

More importantly, however, I cannot agree with the majority's application of its faulty introductory reasoning to part II.C., in which it disagrees with the Court of Appeal's apportionment analysis and judgment. Here, the majority again ignores fundamental contractual principles. Even though Aerojet contracted to operate, in essence, as a self-insured under INA's cash flow insurance policy for eight of the thirty years of the loss period, the majority concludes Aerojet owes no duty to pay its pro rata share of the defense costs during that period because the INA policy did not create "any right or duty in either Aerojet or INA as against the world, including the other insurers." (Maj. opn., *ante,* at p. 70.) The majority believes that an insurer may not seek a pro rata contribution from its insured even if the insured deliberately assumed its own defense costs during a portion of the loss period. Under the language of the applicable insurance policies here, I cannot agree.

The Court of Appeal recognized the importance of applying contract principles to the allocation question presented. The court stated: "In de-

termining what impact Aerojet's self-insured periods should have on its defense entitlements, we consider the scope of the coverage purchased during the insured [or non-INA policy] periods. The policies at issue here all carried similar clauses to those discussed in the allocation cases: (1) 'other insurance' clauses; (2) 'all sums' clauses; and (3) clauses defining the period of coverage. The 'other insurance' clauses here generally state that the insurance provided shall be excess over all such other valid and collectible insurance. The 'all sums' clauses typically obligate the insurer to pay on behalf of the insured all sums which the insured is legally obligated to pay as damages because of injury or property damage to which the insurance applies. The clauses defining the period of coverage provide that the insurance applies only to occurrences which happen during the policy period."

By rejecting the Court of Appeal's judgment allocating a portion of the defense costs to Aerojet on a pro rata basis for the eight years the insured decided to forgo coverage for defense costs, however, the majority chooses to ignore the language of the specific insurance policies that Aerojet purchased and our own *Montrose* opinion. Instead, the majority concludes that Aerojet's contracts with INA and its other insurers were irrelevant, that the language in the "other insurance" clauses was without effect, and that Aerojet never assumed the risk that a loss might occur during the period it was insured by INA's limited cash flow policies. For this reason, the majority refuses to affirm the judgment allocating defense costs to Aerojet on a pro rata basis during the time INA insured it. By making a risk decision when it originally purchased the INA insurance policies to forgo coverage for defense costs it might incur over an eight-year period, Aerojet had no objectively reasonable expectation of coverage for defense costs for occurrences happening during that period. Just as the insurers were free to contract as they pleased, so was Aerojet.

As the trial court and the Court of Appeal held, Aerojet should contribute its pro rata share of defense costs for the period it contracted to pay its own defense costs in exchange for lower premiums and limited cash flow coverage by INA. Instead, the majority hands Aerojet a windfall by forcing successive insurers, including the named defendant here, to prove on remand what we already know: that Aerojet is responsible for defense costs attributable to the extent of its risk management decision. (Maj. opn., *ante*, at pp. 73-74.)

I would affirm the Court of Appeal judgment in its entirety.

Baxter, J., concurred.

Appellants' petition for a rehearing was denied March 11, 1998, and the opinion was modified to read as printed above. Kennard, J., was of the opinion that the petition should be granted.