[No. A081340. First Dist., Div. Four. Mar. 25, 1999.]

CALIFORNIA PACIFIC HOMES, INC., Plaintiff, Cross-defendant and Respondent, v.
SCOTTSDALE INSURANCE COMPANY et al., Defendants, Cross-complainants and Appellants.

**COUNSEL**

Musick, Peeler & Garrett, Susan J. Field, Cheryl A. Orr; Albert, Weiland & Golden and Marcus M. Kaufman for Defendants, Cross-complainants and Appellants.

Latham & Watkins, Robert P. Dahlquist, David L. Mulliken, Kyle W. Hoffman; Law Offices of James A. Roberts and James A. Roberts for Plaintiff, Cross-defendant and Respondent.

**OPINION**

**POCHÉ, Acting P. J.**—Defendants Scottsdale Insurance Company and National Casualty Company appeal from a judgment entered in favor of plaintiff California Pacific Homes, Inc., on its motion for summary adjudication as to certain claims it made against the two insurers in an action seeking declaratory relief.

*Background*

From 1983 to 1986 California Pacific Homes, Inc. (CPH), constructed and sold condominiums in a project called Madrid. On December 12, 1994, CPH was named as a defendant in a lawsuit brought by homeowners of the Madrid Condominium Association which sought damages for construction defects in the Madrid project. That lawsuit, denominated Madrid II by the parties, was settled in 1996 with an agreement by CPH to pay a total of $1,975,000 to the homeowners association. It is undisputed by the parties that the claims against CPH in the Madrid II lawsuit "arose from a single occurrence involving continuous or progressively deteriorating property damage taking place during the entirety of the period from at least 1984 to

June 1, 1995." The parties also stipulated for the purpose of "this lawsuit only" that there is coverage under appellants' policies for Madrid II.

Scottsdale and National Casualty issued successive comprehensive general liability policies to CPH from June 1, 1990, through June 1, 1995.[1] Each of the policies provides that the "insured's retained limit" is $250,000 of ultimate net loss as the result of any one occurrence because of personal injury, property damage, or both combined. The policies each further provide that the insurer will be liable for "$1,750,000 [of] ultimate net loss as the result of any one occurrence because of personal injury, property damage, or both combined" and sets the same dollar limit on an "ultimate net loss as the result of all occurrences during each policy year . . . ."

In 1996 CPH settled the lawsuit brought by the condominium homeowners with a payment of $1,975,000. In constructing the settlement CPH sought funding from various insurers other than Scottsdale and National Casualty that had insured CPH for the period from 1984 to 1990. The formula by which the total settlement amount was allocated was simple—each of the insurers was asked to contribute one-eleventh of the total sum per policy year they were on the risk. Under this allocation Scottsdale and National Casualty as insurers for five policy years were responsible for five-elevenths of the total settlement, or $897,727.[2]

CPH made a demand upon Scottsdale under its 1990-1991 policy that the insurer pay that portion of the Madrid II settlement in excess of CPH's retained limit of $250,000. Scottsdale and National Casualty agreed to contribute $725,982 to the settlement subject to an express reservation of their rights to reimbursement.[3] The insurers adopted the position that before they had any obligation to indemnify, CPH was obligated to satisfy the settlement in an aggregate amount equal to its retained limit for each of the five successive policies totaling $1,250,000.

The present litigation was begun on May 28, 1996, when CPH filed an action seeking declaratory relief and damages for breach of contract under

---

[1]Scottsdale issued three policies for each of the first three years. National Casualty issued a policy for the fourth year and a renewal certificate of that policy for the fifth year. The policy provisions are essentially identical, at least as to any issue raised on this appeal.

[2]As part of the stipulation entered into by the parties CPH agreed not to dispute that the property damage occurred at "other than a continuous, equal rate." Appellants agreed that each of the policies held by CPH for the 11-year period provided coverage.

[3]The amount of their contribution was calculated as follows: from the $897,727 (five-elevenths of the total settlement) CPH's retained limit was deducted as was $24,545 (the amount of subrogation recoveries received). Two additional sums were added: $32,800 (a portion of the defense costs) and $70,000 (sums advanced by CPH to fund the settlement) yielding a net amount paid by Scottsdale and National Casualty of $725,982.

the insurance policies to establish the obligation of Scottsdale and National Casualty to indemnify it for that sum beyond its retained limit of $250,000 up to the policy limit of $1,750,000 for CPH's contribution to settlement of Madrid II.[4] On June 2, 1997, the carriers cross-complained.

CPH filed a motion for summary adjudication on September 8, 1997. A cross-motion for summary judgment was filed by the insurers on the same date. After a hearing on October 28, 1997, the trial court ruled in favor of CPH, concluding that the language of the policy "is clear and explicit" and that it "establishes a retained limit of $250,000 for any one occurrence." Moreover the trial court found that reading consistent with the stipulation of the parties' that the claims made by the Madrid II " 'plaintiffs arose from a single occurrence involving continuous or progressively deteriorating property damage taking place during the entirety of the period from at least 1984 to June 1, 1995.' " Having found no need to interpret the policies the court found that the Madrid II settlement was a claim falling within "a single policy limit" for which CPH had a right to indemnification. Accordingly the court granted CPH's motion for summary judgment, denied that of the insurers, and entered judgment on behalf of CPH. The insurers take this timely appeal from that judgment.

## Discussion

■ We apply a de novo standard of review to a summary judgment by analyzing the construction and effect of the supporting papers in the same manner as does the trial court. (*AARTS Productions, Inc.* v. *Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1064 [225 Cal.Rptr. 203].) Our task here is considerably simplified because the parties entered into a stipulation in June of 1997 as to certain facts and our inquiry turns upon the wording of the insurance contract.[5]

■ As in interpreting all other contracts a court examines an insurance policy seeking to ascertain the mutual intent of the parties. at the time they

---

[4] CPH's complaint originally included other causes of action relating to costs of defense, but it stipulated in 1997 to dismissal of those claims, apparently in order to facilitate resolution of the indemnity issue presently before us.

By the time summary judgment was granted CPH's complaint consisted of: (1) a claim for declaratory relief as to the insurer's duty to fund Madrid II; and, (2) a breach of contract cause of action based upon the insurers' failure to fund settlement of either Madrid II or six lawsuits pending against CPH. The parties had further stipulated that the court's resolution of the application of the retained limits provision in the policies would be binding "with respect to *all the underlying actions*" (italics added) or the six other lawsuits "identified in the complaint filed by CPH."

[5] The stipulation provides in pertinent part that it was "entered into . . . for the sole purpose of facilitating resolution of the issues in this case, including the filing of summary judgment motions."

entered into the agreement. (*Montrose Chemical Corp.* v. *Admiral Ins. Co.* (1995) 10 Cal.4th 645, 666 [42 Cal.Rptr.2d 324, 913 P.2d 878].) We look first to the plain meaning of the policy language. If it is clear and unambiguous we apply that meaning. If there is an ambiguous meaning in an insurance policy it is to be resolved by interpreting the ambiguous provision in the sense the insurer believed the insured would have understood it. (*Id.* at p. 667; Civ. Code, § 1649.) Should that approach fail to resolve the ambiguity the provision must be construed against the party who caused the ambiguity to exist in an effort to protect the objectively reasonable expectations of the insured. Finally, if the ambiguity cannot be resolved by that means the provision must be construed against the insurer. (*Montrose Chemical Corp.* v. *Admiral Ins. Co.*, *supra*, at p. 667.)

■ "[S]tandard comprehensive or commercial general liability [CGL] insurance policies provide that the insurer has a duty to indemnify the insured for those sums that the insured becomes legally obligated to pay as damages for a covered claim." *(Aerojet-General Corp.* v. *Transport Indemnity Co.* (1997) 17 Cal.4th 38, 56 [70 Cal.Rptr.2d 118, 948 P.2d 909].) Such a policy is triggered if the "specified harm is caused by an included occurrence, so long as at least some such harm results within the policy period." (*Ibid.*, fn. omitted, citing *Montrose Chemical Corp.* v. *Admiral Ins. Co.*, *supra*, 10 Cal.4th at pp. 669-673.)

■ Like the trial court we find the language of these insurance policies to be clear and explicit and thus, have no need to look beyond that language for indicia of the parties' mutual intent. The policy language of the relevant CGL policy issued by Scottsdale[6] provides for the insured's retained limit to be $250,000 of the "ultimate net loss as the result of any one occurrence because of . . . property damage." Occurrence is defined as "an accident, event or happening, including injurious exposure to conditions, which result, during the policy period, in . . . property damage . . . ."

The parties stipulated in this instance that the Madrid II claims arose from a single occurrence involving continuous or progressive property damage occurring during the time in which the first Scottsdale policy was in force. Thus, once the ultimate net loss of CPH had exceeded $250,000 the Scottsdale policy provided coverage up to $1,750,000 "as the result of any one occurrence because of . . . property damage."

The trial court found that this result was appropriate under the principles set forth in *Montrose*, specifically as they had been applied in *Armstrong*

---

[6]That policy is No. GLS090868 which was in effect from June 1, 1990, until June 1, 1991.

*World Industries, Inc.* v. *Aetna Casualty & Surety Co.* (1996) 45 Cal.App.4th 1 [52 Cal.Rptr.2d 690].[7] *Armstrong* involved personal injury and property damage claims made by third parties under CGL policies for asbestos exposure. (*Id.* at pp. 34, 41.) The court concluded that such injuries fell within the continuous trigger rule adopted by the Supreme Court in *Montrose.* (*Id.* at p. 43.) The opinion also affirmed the reasoning of the trial court that because each of the CGL policies in question contained a covenant to pay "for 'all sums which the insured shall become liable to pay as damages' " the insured could select one policy, if several provided coverage, to apply to each claim. (*Id.* at pp. 49-50, and fn. 15.) The issue of whether "stacking" should have been allowed was not before the appellate court. (*Ibid.*)

The policy before us does not use the "all sums" terminology, but instead employs "ultimate net loss." That term is defined in the policy as "the sums for which the Insured is legally liable as damages by reason of . . . a settlement made with the written consent of the claimant, the Insured and the Company." The policy provides that "[t]he Company will pay [on] behalf of the Insured the ultimate net loss in excess of the retained limit hereinafter stated which the Insured shall become legally obligated to pay as damages. . . ."

This language is completely consistent with the judgment of the trial court which found that "each of the Defendant Insurers is and was obligated to indemnify California Pacific Homes for that portion of the *Madrid II* settlement that exceeds a single retained limit of $250,000."

The insurers contend that this interpretation is erroneous. They construct a claim which is cantilevered from language in certain cases describing a policy containing a self-insured retention as excess coverage (e.g., *Wiemann* v. *Industrial Underwriters Ins. Co.* (1986) 177 Cal.App.3d 38, 42 [222 Cal.Rptr. 705]) or an excess policy (*General Star Indemnity Co.* v. *Superior Court* (1996) 47 Cal.App.4th 1586, 1593 [55 Cal.Rptr.2d 322]). Then in reliance upon the principle that the duty to indemnify under an excess policy arises only after full payment has been made under the primary policy, appellants argue that CPH (in their view, its own primary insurer) was obligated to exhaust all five policy years worth of retained limits at $250,000

---

[7]The parties have asked us to take judicial notice of the statements of decision filed by the superior court which were the subject of the appeal in *Armstrong World Industries, Inc.* v. *Aetna Casualty & Surety Co., supra,* 45 Cal.App.4th 1. We deny that request. (Evid. Code, §§ 452, 459.)

per year before appellants, as excess carriers, had any duty to indemnify CPH. In short, the insurers ask us to analyze this problem as one of allocation between insurers (themselves as excess carriers and CPH as a primary insurer) rather than as a question of the interpretation of a CGL policy between them and their insured.

We have no quarrel with the principles of law which they cite. Whether they are applicable here is another matter. This trial court clearly applied the self-insured retention amount. What it refused to do was to accept the extension of appellants' argument to find that because the injury was continuous and progressive over five years, all five policies provided coverage and thus all five retained limits must first be satisfied by CPH before the insurers' duty to indemnify arose.

The insurers are in the anomalous position of arguing for stacking of the retained limits. Just as stacking of policies may have the result of providing far more coverage than an insured has purchased, so stacking of retained limits would have the effect of affording an insured far less coverage for occurrence-based claims than the insured has purchased. *(See FMC Corp.* v. *Plaisted & Companies* (1998) 61 Cal.App.4th 1132, 1188-1190 [72 Cal.Rptr.2d 467].)

The policies here are all occurrence policies, and CPH specifically made a demand under the 1990-1991 policy issued to it by Scottsdale. Under the decision of the trial court the insured has received full indemnity for its ultimate net loss beyond the retained limit based upon an occurrence for which the insurers stipulated there was coverage. That ultimate net loss amount did not exceed the coverage limit of the 1990-1991 Scottsdale policy for a single occurrence.

Appellants raise a "strawperson" when they complain that CPH has simply lumped all five policies issued by Scottsdale and National Casualty together and treated them as "a single excess policy subject to one $250,000" retained limit "for the entire 5 year period." Their contention conflates several inquiries. First, as our Supreme Court in *Aerojet* noted, the event which triggers coverage does not define the scope of coverage because once coverage is triggered the policy obligates the insurer to indemnify for the insured's entire loss, subject to the policy limits. (*Aerojet-General Corp.* v. *Transport Indemnity Co., supra,* 17 Cal.4th 38, 57, fn. 10, quoting with approval *Armstrong World Industries, Inc.* v. *Aetna Casualty & Surety Co., supra,* 45 Cal.App.4th 1, 105.) The *Aerojet* opinion went on to reiterate the

*Montrose* analysis to the effect that successive insurers on the risk when continuous or progressively deteriorating property damage first manifests itself are separately and independently obligated to indemnify the insured. (*Aerojet-General Corp.* v. *Transport Indemnity Co., supra,* 17 Cal.4th at pp. 38, 57, fn. 10.) In the present case the insured made a demand under a single policy and the amount of the insured's ultimate net loss as calculated under the settlement allocation was within the policy limits for one occurrence under that single policy. How these insurers choose to proceed as between themselves is not before us.

This distinction is crucial. Appellants argue that the trial court erred in applying the rule of *Armstrong* and instead urge us to apply an analysis based upon *Stonewall Ins. Co.* v. *City of Palos Verdes Estates* (1996) 46 Cal.App.4th 1810 [54 Cal.Rptr.2d 176]. *Stonewall* is inapposite first, because it involved coverage under primary *and* excess policies. The court held that if the primary policies were sufficient to indemnify the insured for property damage claim by a third party, then the loss should be apportioned between the primary insurers without any allocation to the excess carriers. (*Id.* at p. 1853.)

After considering the question of how liability should be borne between several primary insurers and applying principles of equity the court adopted what it characterized as " 'qualified time on the risk' " method of apportionment. (*Stonewall Ins. Co.* v. *City of Palos Verdes Estates, supra,* 46 Cal.App.4th at pp. 1853-1854, fn. 14.) It argued that such a method of allocation would parallel the continuous incremental injury which takes place in a case of progressive and deteriorating property damage. The opinion noted that the court in *Armstrong* "apparently prefers a method that takes policy limits into account." *Stonewall* went on to observe, however, that it and *Armstrong* were in agreement that as to methods of allocation between insurers the trial court retained discretion to select that method which "will produce the most equitable results." (*Ibid.*)

In short, the principle of horizontal exhaustion that appellants seek to invoke based upon *Stonewall* is certainly not compelled here where there was no layer of primary insurance policies as distinct from the policies issued by appellants, which they characterize as being excess. Moreover, the question of allocation of liability was not an issue because any one Scottsdale or National Casualty policy provides sufficient coverage to indemnify the insured. Finally, even if allocation were an issue the method of allocation is a discretionary, equitable choice entrusted to the trial court.

*Disposition*

The judgment is affirmed.

Reardon, J., and Sepulveda, J., concurred.

A petition for a rehearing was denied April 26, 1999, and appellants' petition for review by the Supreme Court was denied June 16, 1999.